# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

MARCUS R. WILLIAMS,

               Plaintiff,

   v.

DERRAL G. ADAMS, et al.,

            Defendants.

_____/

CASE NO. 1:05-cv-00124-AWI-SMS PC

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

(Doc. 77)

## Order on Motion for Summary Judgment

### I.   Procedural History

Plaintiff, Marcus R. Williams ("Plaintiff"), is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff filed this action on January 31, 2005.  The Court screened Plaintiff's Second Amended Complaint pursuant to 28 U.S.C. § 1915A and found that it stated a cognizable claim for relief under section 1983 against Defendants Adams, Hansen, Wan, and Beeler ("Defendants") for denial of exercise in violation of the Eighth Amendment.[1]

Defendants filed a motion for summary judgment on December 1, 2008, Plaintiff filed his

---

[1] On June 4, 2007, Plaintiff's claim for declaratory relief and Eighth Amendment denial of exercise claim against Defendants Peters and Woodford were dismissed, with prejudice, for failure to state a claim; and Defendants Peters and Woodford were dismissed based on plaintiff's failure to state a claim upon which relief may be granted against them.  (Doc. 34.)

opposition on July 1, 2010,[2] and Defendants filed their reply on September 17, 2010.[3]   (Docs. 77-84, 109-118, 122-125.)  For the reasons discussed herein below, Defendants' motion is granted.

It is noteworthy that the documents submitted by the parties on this motion total approximately 2,000 pages.  Such an onerous submission of documents is not well taken by a Court that is already laboring under limited resources with a nationally recognized, burgeoning caseload.  The Court declines to address every piece of paper submitted by the parties and objections thereto, particularly where the parties have not specifically referred to individual pages of evidence.

For the most part, references to pagination of specific documents reflect those indicated on the upper right corners of the parties' submissions via the CM/ECF electronic court docketing system.  Other pagination methods, when utilized, are identified.

Further, the documents submitted by Plaintiff in opposition to this motion are redundant, duplicative, and unnecessarily complicated by the fact that Plaintiff submitted two documents

---

[2] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the Court in an order filed on both July 12, 2007 and August 27, 2012.  Woods v. Carey, 684 F.3d 934 (9th Cir. 2012) Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).  (Docs. 38, 133.)  Plaintiff has not filed a supplemental opposition to Defendants' motion for summary judgment, despite being granted an extension of time to do so.   (Doc. 136.)

Also, Plaintiff may not expand the scope of this litigation via deposition testimony or his opposition to defendants' motion for summary judgment.  See Gilmore v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004).  This action is only proceeding on Plaintiff's claims under the Eighth Amendment for denial of exercise against Defendants Adams, Hansen, Wan, and Beeler.  (Doc. 27.)  Consequently, Plaintiff's arguments and suggestions beyond his cognizable claim of denial of exercise in violation of the Eighth Amendment, such as that he somehow has a claim based on being denied adequate access to the law library (see e.g. Doc. 113, Plntf. Opp., 51: 12-16), are disregarded.

[3] Defendants' motion for summary judgment did not include, but repeatedly referenced a document referred to as the "Stowe Decl." (Docs. 77-85.)  Defendants subsequently clarified that the Robinson declaration was mistakenly referred to as that of Stowe and that all references to the Stowe declaration should instead refer to the Robinson declaration.  (Doc. 129.)  Further, Defendants submitted a number of exhibits with their Reply instead of with their initial moving documents.  (Doc. 124.)  Upon inquiry, Defendants submitted a proof of service showing that these exhibits were served on Plaintiff on July 21, 2008 (Doc. 131, Ex. A) such that Plaintiff received them in sufficient time (over a year and a half prior to the date he filed his opposition) to review them and even incorporated portions of these documents into his opposition (Docs.110:17-70; 111:1-27; 116:15-110; 117:1-75; 118:1-56).  (See Doc. 131.)  Further, despite lapse of more than adequate time, Plaintiff neither objected nor filed a motion to strike. See Yamashita v. People of Territory of Guam, 59 F.3d 114, 117 (9th Cir. 1995).  Plaintiff has thus waived any objections and/or arguments against the admissibility of the exhibits submitted in Defendants' Reply and they are properly considered.

with separate sets of attached exhibits; rather than a solitary statement delineating his opposing evidence to dispute the facts Defendants assert as undisputed.  One of these documents is entitled "Plaintiff's Concise Statement of Disputed Facts and Response to Defendants' Statement of Facts" ("PDF") (Docs. 113-118) in which Plaintiff  admits and disputes the facts Defendants assert as undisputed.  However, in the PDF, rather than citing to and relying on specific contradicting evidence attached thereto, Plaintiff refers to the other document he submitted entitled "Plaintiff's Statement of Facts and Response Declaration" ("PSFR").  (Docs. 109-112.)

The statements of fact in the PDF and the PSFR are not numerically correlated and raise different objections/disputes to Defendants' statements of fact.  Further, both the PDF and the PSFR contain exhibits.  Unfortunately, the exhibits to the PDF, while similarly identified via Roman Numerals, do not contain the same number of pages per exhibit as the exhibits to the PSFR that bear the same Roman Numeral.  Thus, review of an exhibit referenced by Plaintiff had required not only review of the exhibit attached to the PDF, but also that attached to the PSFR, followed by comparison of the individual pages within each.  Thus, consideration of Plaintiff's opposition is unnecessarily convoluted since the PDF and the PSFR both required review, cross-referencing, and extrapolation to ascertain which of the facts Defendants assert is undisputed Plaintiff actually disputes, to identify the evidence upon which Plaintiff relies to attempt to establish a given dispute, and to ascertain whether that evidence is admissible and establishes a dispute.

Likewise, review and consideration of Defendants' reply is also unnecessarily convoluted as they did not respond and raise objections to Plaintiff's statement of disputed facts in one document.  Rather, they submitted three documents: "Defendants' Evidentiary Objections to Plaintiff's Exhibits" ("DEOPE") (Doc. 122); "Defendants' Responses and Evidentiary Objections to Plaintiff's Statement of Disputed Facts" ("DR&E") (Doc. 123); and "Defendants' Reply to Plaintiff's Concise Statement of Disputed Facts" ("DRPCS") (Doc. 125).  There is no ascertainable basis to necessitate Defendants' filing of three documents where one would have sufficed and Defendants provide none.  A plaintiff's filing of multiple documents in opposition to a defense statement of undisputed facts does not require a defense reply to follow suit.  In the

future, the Court strongly encourages defense counsel to consider whether documents submitted on any given motion are clear and concise, or will only serve to burden the Court with unnecessarily segmented, multiple, and redundant filings.

This Court has painstakingly waded through all documents submitted addressing this motion, opposition, and reply.  All arguments, points and authorities, declarations, depositions, exhibits, statements of undisputed facts and responses thereto, objections, and other papers filed by the parties have been carefully reviewed and considered.  Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection.  This Court thoroughly reviewed and considered the evidence submitted, but comments only on that deemed admissible, material, and appropriate.

The motion is deemed submitted.  Local Rule 230(l).

## II.   Legal Standards for Motions for Summary Judgment

Any party may move for summary judgment which shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1).  While the Court may consider other materials in the record not cited to by the parties, it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

As the moving party, Defendants bear the initial burden of proving the absence of a genuine dispute of material fact.  In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Because Plaintiff bears the burden of proof at trial, Defendants need only prove that there is an absence of evidence to support Plaintiff's case.  In re Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 326)

4

(quotation marks omitted).  If Defendants meet the initial burden, the burden shifts to Plaintiff to designate specific facts demonstrating the existence of genuine issues for trial.  Id. (*citing* Celotex, 477 U.S. at 324).

In resolving Defendants' motion for summary judgment, all of the evidence must be viewed in the light most favorable to Plaintiff as the non-moving party, Garcia v. County of Merced, 639 F.3d 1206, 1208 (9th Cir. 2011); Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011), all reasonable inferences must be drawn in his favor, LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1136 (9th Cir. 2009); Pinard v. Clatskanie School Dist. 6J, 467 F.3d 755, 763 (9th Cir. 2006), and his response is treated more indulgently because he is the nonmoving party, Lew, 754 F.3d at 1423.  However, Plaintiff must support his opposition with admissible evidence.

Verified pleadings and verified oppositions constitute opposing declarations so long as they are based on personal knowledge and they set forth facts admissible in evidence to which the declarant is competent to testify, Moran v. Selig, 447 F.3d 748, 759-60 (9th Cir. 2006); Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004); Lopez v. Smith, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000); Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998); Schroeder v. McDonald, 55 F.3d 454, 460 n.11 (9th Cir. 1995); McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curiam); Lew, 754 F.2d at 1423, with personal knowledge and competence to testify inferable from the declarations themselves, Barthelemy v. Air Line Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990) (per curiam) (quotation marks omitted); *also* Sea-Land Service, Inc. v. Lozen Intern, LLC, 285 F.3d 808, 819 (9th Cir. 2002).  Arguments or contentions set forth in an unverified responding brief, on the other hand, do not constitute evidence.  *See* Coverdell v. Dep't of Soc. & Health Servs., 834 F.2d 758, 762 (9th Cir. 1987) (recitation of unsworn facts not evidence).  Since unverified, neither his opposition, nor the PDF have any evidentiary value.[4] However, the amended complaint and the PSFR are both admissible since verified.  (Docs. 26,

---

[4] Plaintiff filed a separate response to Defendant's statement of undisputed facts ("DUF") and an opposition, though both were entered in the CM/ECF docket as one document.  (Doc. 113 pp. 1-43 and pp. 44-87 respectively.)

109.)

III.    **Evidentiary Objections**

A.    **Defendants' Objections**

In conjunction with their reply, Defendants filed various evidentiary objections. (Docs. 122, 123.) In light of the legal standard detailed in the previous section and explanations provided in the following sections, the Court declines to individually address the objections, with the exception of the objections raised in the DEOPE (Doc. 122) to Plaintiff's Exhibit XIII "Deprivation Study of the Effects of Isolation," Exhibit XIV "Medical Records," and Exhibit XVI "Special Master Findings" for relevance and lack of authentication and foundation.[5]

**1.    Relevance**

Given the Court's duty to determine whether there exists a genuine dispute as to any *material* fact, an independent objection to evidence as irrelevant is both unnecessary and unhelpful. *E.g.*, Carden v. Chenega Sec. & Protections Servs., LLC, No. CIV 2:09-1799 WBS CMK, 2011 WL 1807384, at *3 (E.D.Cal. May 10, 2011); Arias v. McHugh, No. CIV 2:09-690 WBS GGH, 2010 WL 2511175, at *6 (E.D.Cal. Jun. 17, 2010); Tracchia v. Tilton, No. CIV S-06-2916 GEB KJM P, 2009 WL 3055222, at *3 (E.D.Cal. Sept. 21, 2009); Burch v. Regents of the University of California, 433 F.Supp.2d 1110, 1119 (E.D.Cal. Jun. 5, 2006). Defendants' objections on relevancy grounds are therefore disregarded. The Court strongly encourages Defendants' counsel to reconsider burdening the Court with unnecessary evidentiary objections.

**2.    Authentication and Foundation**

Federal Rule of Evidence 901(a) requires "authentication or identification as a condition precedent to admissibility." A foundation must be laid "by evidence sufficient to support a finding that the matter in question is what its proponent claims" before evidence may be admitted. Fed.R.Evid. 901(a). Unauthenticated documents cannot be considered in a motion for

---

[5] Defendants also object that these three documents contain inadmissible hearsay. However, such objection need not be reached since these three exhibits address neither whether the lockdowns that restricted Plaintiff's time out of his cell where imposed for safety and security reasons, nor whether the "modified program" that became the "normal program" provided sufficient out of cell time under the Eighth Amendment – which are the core questions/issues in this motion.

1  summary judgment, <u>Las Vegas Sands, LLC v. Nehme</u>, 632 F.3d 526, 533 (9th Cir. 2011) (*citing*

2  <u>Orr v. Bank of America, NT & SA</u>, 285 F.3d 764, 773 (9th Cir. 2002)) (quotation marks

3  omitted).  Therefore, lack of proper authentication is an appropriate objection where a

4  document's authenticity is genuinely in dispute.

5          An inquiry into authenticity concerns the genuineness of an item of evidence, not its

6  admissibility, <u>Orr</u>, 285 F.3d at 776, and documents may be authenticated by review of their

7  contents if they appear to be sufficiently genuine, <u>Las Vegas Sands, LLC</u>, 632 F.3d at 533 (*citing*

8  <u>Orr</u>, 285 F.3d at 778 n.24) (quotation marks omitted).

9          The appearance, contents, and substance of Plaintiff's Exhibit XIV "Medical Records"

10 and Exhibit XVI "Special Master Findings" lead the Court to easily conclude that the documents

11 have been authenticated by their distinctive characteristics and that they are what they appear to

12 be: official prison records of medical care and treatment rendered to Plaintiff and the Special

13 Master's Final Report which issued in the Northern District of California, United States District

14 Court in <u>Madrid v. Tilton</u>, Case No. C90-3094-T.E.H..  *See* Fed. R. Evid. 901(b)(4); <u>Las Vegas</u>

15 <u>Sands, LLC</u>, 632 F.3d at 533; *see also* <u>Abdullah v. CDC</u>, No. CIV S-06-2378 MCE JFM P, 2010

16 WL4813572, at *3 (E.D.Cal. Nov. 19, 2010) (finding an objection for lack of foundation and

17 authentication unavailing where the records were from the plaintiff's prison file and they were

18 created and maintained by prison officials); <u>Sanchez v. Penner</u>, No. CIV S-07-0542 MCE EFB P,

19 2009 WL 3088331, at *5 (E.D.Cal. Sept. 22, 2009) (overruling lack of foundation and proper

20 authentication objections to prison medical records submitted by the plaintiff); <u>Johnson v. Roche</u>,

21 No. CIV S-06-1676 GEB EFB P, 2009 WL 720891, at *6 (E.D.Cal. Mar. 13, 2009) (overruling

22 lack of foundation and proper authentication objections to prison records); <u>Burch</u>, 433 F.Supp.2d

23 at 1119 (overruling objections to the introduction of documentary evidence where the defendants

24 did not actually dispute the authenticity of them and where the plaintiff would be able to

25 authenticate them at trial).

26         If Defendants genuinely disputed the authenticity of these two exhibits, more specific

27 objections could have been made.  However, since Defendants' objections were neither specific

28 nor detailed, the bare objection to Plaintiff's use of prison medical records and a Special Master's

Final Report in <u>Madrid</u>, for lack of proper authentication is overruled.  Fed. R. Evid. 901(b)(4);

<u>Las Vegas Sands, LLC</u>, 632 F.3d at 533.

Plaintiff's Exhibit XIII "Deprivation Study of the Effects of Isolation" appears to be either an article from a magazine/newspaper, or a self-contained piece of literature such as a pamphlet or small book.  The article is not self authenticating, nor does it appear to be excerpted from any official prison records.  Plaintiff merely attached this article as an exhibit to the PDF and the PSFR, which does not equate to proper authentication.  *See* <u>Beyene v. Coleman Security Services, Inc.</u>, 854 F.2d 1179, 1182 (9th Cir. 1988).  Defendants' objection to Plaintiff's Exhibit XIII "Deprivation Study of the Effects of Isolation" for lack of proper authentication is sustained.

### 3.    Inadmissible Lay Opinion

Defendants also object to the content of the medical records submitted by Plaintiff (Doc. 112, PSFR Ex. XIV, pp. 55-66; Doc. 113-1, PDF Ex., pp. 31-44) arguing both that they do not attribute Plaintiff's complaints of headaches and/or gastro-intestinal upset to a lack of outdoor exercise and that they do not, and cannot, absent supporting expert medical testimony, establish the proximate cause of Plaintiff's medical conditions.  (Doc. 124, Def. Reply, 8:8-19.)

Persons who do not have medical training do not qualify as expert witnesses such that any opinions they might render as to causation of a medical condition are inadmissible since they cannot be found to be based on reliable principles and methods.  Fed. R. Evid.702.  Further, lay opinions are admissible only if rationally based on the witness's perception; if helpful to clearly understand testimony or determine a fact in issue; and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.  Fed. R. Evid. 701.  Thus, in regards to his medical condition, Plaintiff may only submit his testimony as to the symptoms he personally experienced, but may not offer opinions as to their cause, or as to any diagnosis of a medical condition based on those symptoms.  Accordingly, Plaintiff's opinion that the dizziness, headaches, sore joints, and stiff muscles he experienced from January through May of 2005 and his hypertension/high blood pressure likely worsened due to a lack of outdoor exercise (*See* Doc. 109, PSFRs 44, 45) are inadmissible.  Defendants' objection to Plaintiff's lay opinion as to the cause of his medical conditions is sustained.

B.     **Plaintiff's Objections**

1.     **Prison Disciplinary Record**

In his opposition, Plaintiff objects under Rules of Evidence 608 and 609 to Defendants' use and reference of his prison disciplinary record. (Doc. 109, PSFR 49; Doc. 113, PDFs 11-14.) Plaintiff argues that his disciplinary record is irrelevant, prejudicial, and not probative since Defendants do not argue that misconduct by Plaintiff caused any of the lockdowns in question. (Id., PSFR 49.) Plaintiff repeatedly argues that he, and others similarly situated as general population ("GP") inmates, should not have been subjected to lockdowns when only a few inmates were involved in a given altercation. (Doc. 109, PSFRs 30, 32, 34-38.) However, as noted by Defendants in their reply, Plaintiff's disciplinary record is relevant to counter Plaintiff's argument that he "was not a threat to the safety and security of the prison and thus, lockdowns served no penological purpose as applied to him." (Doc. 123, Def. Resp. & Obj to PSFR 49, p. 16.) Plaintiff's prison disciplinary record contains a number of infractions. When there has been an attack within a prison population, even model prisoners are subjected to changes in programming until the instigators and/or perpetrators are identified and safety/security issues are resolved. The fact that Plaintiff's prison disciplinary records contains a number of infractions is not relevant to this motion and Defendants do not submit it for purposes of Plaintiff's guilt for any such infractions; rather it is relevant to show that it was not unreasonable for prison officials to have subjected Plaintiff to lockdowns imposed on a suspect segment of the prison population of which Plaintiff happened to be a member until investigation had been conducted and the security concerns had abated.

Accordingly, Plaintiff's objections to Defendants' use and reference of his prison disciplinary record are overruled.

2.     **Expert Witness Qualifications**

Plaintiff also variously objects that Defendants have not been qualified as expert witnesses such that their declarations should not be admissible as evidentiary support for the present motion. (Doc. 113, PDF, pp. 11, 13.) Defendant Wan's declaration shows that he is currently the Associate Warden for Central Services and Facility C of SATF; that he was the

second watch Facility C Program Lieutenant from December 2, 2003 to May, 2004; and was the acting Facility Captain from May 1, 2004 to July 19, 2004, when he was promoted to the Facility C Captain where he served until October 1, 2005.  (Doc. 82, Wan Decl., ¶ 2.)  These titles and the various accompanying tasks and job duties require a level of knowledge and training which qualifies Defendant Wan as an expert on prison matters.  Further, it has been held, that on the issue of deprivation of outdoor exercise subsequent to incidents of prison violence, ". . . prison officials are entitled to ' "wide-ranging deference." ' " Noble v. Adams, 646 F.3d 1138, 1143 (9th Cir. 2011) (quoting Norwood v. Vance, 591 F.3d 1062, 1069 (quoting Bell v. Wolfish, 441 U.S. 520, 547(1979))).  The declarations of Beeler and Robinson contain only factual statements and are devoid of any opinion(s) so as not to require expert qualification.

Thus, Plaintiff's objections that Defendants have not been qualified as expert witnesses such that their declarations should not be admissible as evidentiary support for the present motion are overruled.

**IV.   Plaintiff's Opposing Evidence**

As previously stated, Plaintiff submitted multiple, voluminous documents in opposition to the current motion.  Even so, most of his opposition does not comply with procedural requirements and/or is not admissible for varying reasons.

The summary judgment rules apply with equal force to pro se litigants because they "must follow the same rules of procedure that govern other litigants." King v. Atiyeh, 814 F.2d 565, 567 (9th Cir.1987).   In fact, in Jacobsen v. Filler, 790 F.2d 1362 (9th Cir.1986), the Court rejected the argument that pro se non-prisoner litigants are entitled to notice from the court regarding the requirements of Rule 56.  In so doing, the Court unequivocally stated that "pro se litigants in the ordinary civil case should not be treated more favorably than parties with attorneys of record." Id. at 1364.  Accordingly, although Plaintiff is appearing pro se, he is held to the same standards as any other represented party on a motion for summary judgment.  While the Court sympathizes with the difficulties Plaintiff faces in proceeding pro se, it is still Plaintiff's burden to have pursued his own discovery and to identify evidence on which he relies for the Court.

1    When denying a purportedly undisputed material fact, a party must provide specific

2    "citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer,

3    admission, or other document relied upon in support of that denial." L.R. 260(b); *see also* F.R.E.

4    56(c)(1)(A). Much of the documentary evidence Plaintiff submitted is not specifically

5    identified/referenced and is insufficient to raise a triable issue of fact. A number of Plaintiff's

6    references to evidence he relies on to deny defense statements of fact do not include "a citation to

7    the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or

8    other document relied upon." Local Rule 260 and F.R.E. 56(c)(1)(A). Plaintiff's submissions of

9    multiple paged documents as exhibits with only reference to the exhibit in general, without

10   directing the Court to the specific part of the exhibit relied on, does not suffice to meet his

11   opposing evidentiary burden.

12   Further, Plaintiff's declaration and/or statements that he lacks sufficient information or

13   knowledge (*see* Doc 113, PDF, pp. 7, 8, 10, 22, 23, 27, 28) does not "set forth specific facts

14   showing that there is a genuine issue for trial" of any given fact. <u>Henderson v. City of Simi</u>

15   <u>Valley</u>, 305 F.3d 1052, 1056 (9th Cir. 2002).

16   **V.   Plaintiff's Cognizable Allegations and Claims in the Second Amended Complaint[6]**

17   Plaintiff alleged that between January 2004 and June 2005, he was denied adequate

18   out-of-cell exercise and confined to his cell for an average of twenty-three and a half to

19   twenty-four (23 ½ - 24) hours a day, in violation of the Eighth Amendment. (Doc. 26, 2nd A/C.)

20   Under federal notice pleading standards, Plaintiff's allegations were found sufficient to

21   give rise to a claim for relief against defendants Adams, Hansen, Wan, and Beeler. (Doc. 27

22   Screen F&R; Doc. 43, O Adopt.) Plaintiff alleged that these Defendants were employed at the

23   institution in question, looked into the situation complained of, and found that inmates were

24   being provided with adequate exercise -- which Plaintiff alleged was erroneous. Given their

25   positions and titles, Defendants arguably had first hand knowledge of the conditions and the

26

27        [6] This rendition of the factual allegations upon which Plaintiff's claims against Defendants were found
     cognizable is presented here for overview purposes only. Undisputed and disputed material facts are discussed
28   where applicable in the following sections.

11

authority to make corrections.  Plaintiff's allegations were accepted as true, <u>Hospital Bldg. Co. v.</u>
<u>Rex Hospital Trustees</u>, 425 U.S. 738, 740 (1976), construed in the light most favorable to
Plaintiff, and all doubts were resolved in Plaintiff's favor, <u>Jenkins v. McKeithen</u>, 395 U.S. 411,
421 (1969).  (Doc. 27, Screen F&R; Doc. 43, O Adopt.)

**VI.    Defendants' Motion for Summary Judgment**

Defendants move for summary judgment arguing that:

(1)    Defendant Beeler did not cause the alleged deprivation by denying Plaintiff's
inmate appeal (Doc. 78, MSJ, pp. 16-18);

(2)    under the normal program, Plaintiff received six hours out-of-cell time per week,
which was not a deprivation of the minimal civilized measures of life's necessities
so as to implicate the Eighth Amendment (<u>id.</u>, at pp. 7-12);

(3)    Defendants were not deliberately indifferent in assigning the yard schedule or
imposing and continuing lockdowns since the legitimate penological purposes of
institutional safety and security justified their actions (<u>id.</u>, at pp. 12-14); and

(4)    Defendants are entitled to qualified immunity (<u>id.</u>, at pp. 14-16).

**A.    Defendant Beeler – Review of Plaintiff's Inmate Appeal**

**1.    Undisputed and Disputed Facts**

Defendants present evidence to show that Defendant Beeler's duties did not include
preparing yard or dayroom schedules, or imposing lockdowns, and that Defendant Beeler's only
connection to Plaintiff was review and denial of Plaintiff's inmate appeal.  (Doc. 79, DUF 5;
Doc. 80, Beeler Decl.¶ 3; Plaintiff's Deposition ("Plntf. Dep.") 66:25-67:2.)  This is sufficient to
meet their burden of proving the absence of a genuine dispute of material fact such that the
burden shifts to Plaintiff to designate specific facts demonstrating the existence of genuine issues
for trial.  <u>In re Oracle Corp.</u>, 627 F.3d at 387 (*citing* <u>Celotex</u>, 477 U.S. at 324).

Plaintiff attempts to demonstrate a dispute of these facts by stating that "in being
employed and duly trained by CDCR as Lieutenant, Defendant Beeler had an affirmative duty
and responsibility to enforce the laws, regulations, and procedures which govern the actions and
activities of prisoners (PSFRs 4, 6) and part of Defendants [sic] Beeler duties and responsibilities

consisted of interviewing prisoners regarding administrative 602/appeal grievances: gathering and investigating relevant facts to greivances [sic] filed by prisoners and Plaintiff believes that as part of his duties and responsibilities Beeler meet [sic] with his superiors Defendants Wan (Cpt) and Adams (W) regularly in preparing and enforcing the CSATF yard and dayroom schedules and imposing lockdowns as part of his duties and responsibilities as a supervisor of day to day functions, activities, services, etc. of prisoners. (PSFR 4)."  (Doc. 113, PDF 5.)

In PSFR 4, Plaintiff states "Defendant D. Beeler has been employed with CDCR from 1997 to May 2005 and was at all relevant times to the pending matter employed at CSATF as Lieutenant [sic] responsible for among [sic] things the day to day functions, services, activities of the prison program and for reviewing, investigating and responding to prisoners [sic] 602/appeal grievances See Ex. 'I' D."  Exhibit "I" D is a set of interrogatories and responses Plaintiff propounded on Defendant Beeler.

In PSFR 6, Plaintiff states that  "[a]ll employees of the Department shall be responsible to enforce the laws regulations and procedures which govern the actions and activities of prisoners and of those persons who come into contact with prisoners See Ex. 'III'."  Exhibit "III" is forty-four (44) pages out of Title 15 of the California Code of Regulations and Plaintiff neither directs the Court to a specific section therein, nor does he show any basis to impose responsibility on prison personnel beyond ensuring that they perform their specific job duties in a manner which comports with applicable laws, regulations, and procedures.

## 2. <u>Legal Standard</u>

"[A prison] grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates." <u>Azeez v. DeRobertis</u>, 568 F. Supp. 8, 10 (N.D. Ill. 1982) *accord* <u>Buckley v. Barlow</u>, 997 F.2d 494, 495 (8th Cir. 1993); *see also* <u>Ramirez v. Galaza</u>, 334 F.3d 850, 860 (9th Cir. 2003) (no liberty interest in processing of appeals because no entitlement to a specific grievance procedure); <u>Massey v. Helman</u>, 259 F.3d 641, 647 (7th Cir. 2001) (existence of grievance procedure confers no liberty interest on prisoner); <u>Mann v. Adams</u>, 855 F.2d 639, 640 (9th Cir. 1988).  "Hence, it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the Fourteenth Amendment."  <u>Azeez</u>, 568 F.

Supp. at 10; Spencer v. Moore, 638 F. Supp. 315, 316 (E.D. Mo. 1986).

Actions in reviewing a prisoner's administrative appeal cannot serve as the basis for liability under a § 1983 action. Buckley, 997 F.2d at 495. The argument that anyone who knows about a violation of the Constitution, and fails to cure it, has violated the Constitution himself is not correct. "Only persons who cause or participate in the violations are responsible. Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation." Greeno v. Daley, 414 F.3d 645, 656-57 (7th Cir.2005) *accord* George v. Smith, 507 F.3d 605, 609-10 (7th Cir. 2007); Reed v. McBride, 178 F.3d 849, 851-52 (7th Cir.1999); Vance v. Peters, 97 F.3d 987, 992-93 (7th Cir.1996).

Further, when resolving a claim under the Eighth Amendment against individual defendants, causation must be resolved via "a very individualized approach which accounts for the duties, discretion, and means of each defendant." Leer v. Murphy, 844 F.2d 628, 633-34 (9th Cir. 1988) *citing with approval* Williams v. Bennett, 689 F.2d 1370, 1384 (11th Cir. 1982) ("There can be no duty, the breach of which is actionable, to do that which is beyond the power, authority, or means of the charged party. One may be callously indifferent to the fate of prisoners and yet not be liable for their injuries. Those whose callous indifference results in liability are those under a duty -- possessed of authority and means -- to prevent the injury.")

### 3.    Discussion

As stated above, Defendants submitted evidence that shows Defendant Beeler's duties did not include preparing yard or dayroom schedules or imposing lockdowns and that Defendant Beeler's only connection to Plaintiff was the review and denial of Plaintiff's inmate appeal. (Doc. 79, DUF 5; Doc. 80, Beeler Decl.¶ 3; Plntf. Dep. 66:25-67:2.) This is sufficient to meet Defendants burden to shift the burden to Plaintiff to establish that a genuine issue as to any material fact actually does exist. *See* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The evidence Plaintiff submitted is based on his *belief* that: Defendant Beeler's duties included meeting with Defendants Wan and Adams to prepare and enforce lockdowns and yard and dayroom schedules (Doc. 113, PDF 3); Defendant Beeler's mere employment with CDCR

for an extended period of years made him responsible for day to day functions, services, activities

of the prison program (Doc. 109, PSFR 4); and just by being a CDCR employee, Defendant

Beeler was responsible for enforcing the laws regulations and procedures which govern the

actions and activities of prisoners and of those persons who come into contact with prisoners (id.,

at PSFR 6).  However, Plaintiff's mere belief in these statements does not make them true,

particularly where Plaintiff has not shown a basis to have personal knowledge of Defendant

Beeler's job duties and responsibilities to make his opinions admissible.  F.R.E. 56 (c)(4).

The documentary evidence Plaintiff submitted is also insufficient to raise a triable issue

of fact.  Plaintiff's references to the evidence he relies on in opposition to the defense statements

of fact do not include "a citation to the particular portions of any pleading, affidavit, deposition,

interrogatory answer, admission, or other document relied upon."  Local Rule 260 and F.R.E.

56(c)(1(A).  A plaintiff's submissions of multiple paged documents as exhibits with only

reference to the exhibit in general, without specifically directing the Court to the part of the

exhibit relied on, does not suffice to meet an opposing evidentiary burden.

Additionally, while the Court declines to read all of the pages Plaintiff submitted as

exhibits (i.e. forty-five (45) pages of Title 15 were attached as Exhibit III, referenced in PSFR 6),

the evidence referenced in PSFR 4 (Exhibit I, D) was reviewed and found not only to be

incomplete (lacking page 5), but the interrogatory responses therein that addressed Defendant

Beeler's job duties do not support Plaintiff's assertions in PSFR 4.[7]  The interrogatory responses

did not show that Defendant Beeler was responsible for "the day to day functions, services,

activities of the prison program" and there is no information in those responses suggesting that

Defendant Beeler's duties required him to "meet [sic] with his superiors Defendants Wan (Cpt)

and Adams (W) regularly in preparing and enforcing the CSATF yard and dayroom schedules

and imposing lockdowns as part of his duties and responsibilities as a supervisor of day to day

functions, activities, services, etc. of prisoners" as Plaintiff asserts.

---

[7] Though not required, the Court *may* consider materials in the record not specifically cited to by the parties.
Fed. R. Civ. P. 56(c)(3); Carmen, 237 F.3d at 1031.

1      Plaintiff fails to meet his burden to establish that Defendant Beeler had any responsibility

2  for scheduling yard and/or dayroom schedules and/or imposition of lockdowns.  Defendant

3  Beeler's only involvement in the issues raised in this case was in the review and handling of

4  Plaintiff's inmate appeals thereon -- which does not provide a basis for liability in an action

5  under § 1983.

6      Defendants have met their burden of proving that no triable issue of fact exists as to

7  Defendant Beeler's involvement in the allegations in this case.  Since Plaintiff fails to

8  demonstrate the existence of genuine issues of material dispute as to Defendant Beeler's

9  involvement in this case, Defendant Beeler is entitled to summary judgment on Plaintiff's claims

10  against him.

11     **B.**    **Eighth Amendment – Exercise/Cell Confinement**

12     **1.**    **Legal Standard**

13      "[W]hile conditions of confinement may be, and often are, restrictive and harsh, they

14  'must not involve the wanton and unnecessary infliction of pain.'"  Morgan v. Morgensen, 465

15  F.3d 1041, 1045 (9th Cir. 2006) (*quoting* Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).  The

16  Eighth Amendment, which protects prisoners from inhumane conditions of confinement, Farmer

17  v. Brennan, 511 U.S. 825, 833 (1994), is violated when prison officials act with deliberate

18  indifference to a substantial risk of harm to an inmate's health or safety, *e.g.*, Farmer, 511 U.S. at

19  828; Thomas v. Ponder, 611 F.3d 1144, 1151-52 (9th Cir. 2010); Richardson v. Runnels, 594

20  F.3d 666, 672 (9th Cir. 2010).

21      Two requirements must be met to show an Eighth Amendment violation.  Farmer, 511

22  U.S. at 834.  First, the deprivation must be, objectively, sufficiently serious.  Id. (quotation marks

23  and citation omitted).  The objective component is contextual and responsive to contemporary

24  standards of decency.  Hudson v. McMillian, 503 U.S. 1, 8 (1992).  "Extreme deprivations are

25  required to make out an Eighth Amendment conditions-of-confinement claim."  Id., 503 U.S. at

26  9.  "Because routine discomfort is part of the penalty that criminal offenders pay for their

27  offenses against society, only those deprivations denying the minimal civilized measure of life's

28  necessities are sufficiently grave to form the basis of an Eighth Amendment violation."  Id.

(quotation marks and citations omitted).

Second, prison officials must have a sufficiently culpable state of mind, which for claims regarding conditions of confinement is deliberate indifference. Farmer, 511 U.S. at 834 (quotation marks omitted). Prison officials act with deliberate indifference when they know of and disregard an excessive risk to inmate health or safety. Farmer, 511 U.S. at 837 (quotation marks omitted). Thus, prison officials may be held liable under the Eighth Amendment for denying humane conditions of confinement only if they know that inmates face a substantial risk of harm and they disregard that risk by failing to take reasonable measures to abate it. Id. at 847 (quotation marks omitted).

Inmates have a constitutional right to exercise and the denial of out-of-cell exercise for an extended period of time is sufficiently serious to state a claim under the Eighth Amendment. Thomas, 611 F.3d at 1151-52. There is no bright line in terms of how many hours of out-of-cell exercise per week satisfy the Constitution. See Noble, 646 F.3d at 1139-43 (qualified immunity applies as it is not established that no outdoor exercise or other privileges for approximately fifteen months due to emergency circumstances constituted a constitutional violation: "it was not clearly established in 2002 — nor is it established yet — precisely how, according to the Constitution, or when a prison facility housing problem inmates must return to normal operations"); Hebbe v. Pliler, 627 F.3d 338, 343-44 (9th Cir. 2010) (inmate impermissibly required to choose between exercise and law library access during the eight hours a week permitted out of his cell); Thomas, 611 F.3d at 1151-52 (no out-of-cell exercise for thirteen months created "substantial risk of serious harm" to inmate); Pierce v. County of Orange, 526 F.3d 1190, 1211-13 (9th Cir. 2008) (at least two days a week for at least two hours total per week provided sufficient exercise); LeMaire v. Maass, 12 F.3d 1444, 1457-58 (9th Cir. 1993) (no out-of-cell exercise for most of a five-year period is an objectively serious deprivation); Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir. 1994) (in-cell confinement for almost twenty-four hours a day and forty-five minutes of outside exercise per week for a six-week period is an objectively serious deprivation); Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979) (fewer than five hours of exercise per week and no outdoor exercise for some inmates over a period of years is a

constitutional violation).  Short-term, temporary deprivations of exercise without medical effects are not sufficiently serious to support an Eighth Amendment claim, Thomas, 611 F.3d at 1155; Norwood, 591 F.3d at 1070; May v. Baldwin, 109 F.3d 557, 565 (9th Cir. 1997);  Allen, 48 F.3d at 1088, but the deprivation of exercise for a period of six weeks can support a claim, Allen, 48 F.3d at 1088.

These standards apply to the multiple factual scenarios in this case which will be addressed in the following order: Modified/Normal Program; Lockdowns Generally; Specific Lockdowns (15); and Cumulative Effect (of individual lockdowns).[8]  A preliminary discussion of the general background regarding the parties and the facility involved is helpful.

## 2. **General Background**

### a. **The Parties**

At all relevant times, Defendant Adams was employed as the Warden of SATF; Defendant Hansen was employed as Associate Warden of SATF; Defendant Wan was employed as the second watch Facility C Program Lieutenant from December 3, 2003, to May 1, 2004, acting Facility C Captain from May 1, 2004 until July 19, 2004, when he was promoted to the Facility C Captain, and served as Facility C Captain until October 1, 2005; and Defendant Beeler was employed as a correctional office with the rank of Lieutenant, Facility D, at SATF.

Plaintiff is a level four prisoner who arrived at SATF on January 13, 2004.  At all relevant times, Plaintiff was a GP inmate, confined at SATF, in Facility IV-C, Building C-7, with a cell-mate.  On January 29, 2004, Plaintiff was classified and cleared for yard.  On June 4, 2005, Plaintiff was removed from SATF GP after he stabbed two correctional officers with a sharpened piece of metal.  Plaintiff has had approximately twenty rules violations, including approximately three for possession of weapons; three for possession of contraband; three for assault on fellow

---

[8] From hereon, DUFs (Doc. 79) which were not brought into dispute by Plaintiff through the submission of admissible evidence are generally stated.  It is noteworthy that a considerable number of Plaintiff's attempts to raise disputes rely on either Plaintiff's declaration that he lacks information and belief, or on exhibits with multiple pages without directing the court to a specific page and/or item.  As previously stated, Plaintiff's lack of information and knowledge does not establish an issue of fact and the Court need not consider multiple paged exhibits where the submitting party fails to cite to the specific portion relied on.  Where applicable, adequately raised, and addressing a material issue of fact, Plaintiff's opposing objections, specific evidence, and argument are discussed.

inmates; and two for assault on staff and he has been placed in the Security Housing Unit

("SHU") four times: in 1996–assault on an inmate; in 1999–assault on staff; in 2003–possession

of a weapon; and in 2005–assault on staff.

### b.   SATF Facility IV-C

SATF is a medium-maximum security state prison.  It consists of seven Facilities,

(designated A-G), divided into four Complexes (designated I-IV), as follows:  Complex I

consists of Facility A and Facility B, which are Level II (medium, dormitory setting) housing

facilities.  Facility A is designed for sensitive needs (protective custody).  Complex II consists of

Facility C, which is a Level IV, maximum-security (180° design) facility.  It is called a "180°

Facility" because a guard standing in front of the buildings can see all buildings at once in a 180°

arc.  Plaintiff was housed in Facility C.  Complex III consists of Facility D, a Level IV

maximum-security (270° design) facility and Facility E, a Level III maximum-security (270°

design) facility.  Both Facilities D and E are designed to house the sensitive needs (protective

custody) inmates.  Complex IV consists of Facility F and Facility G, which are Level II substance

abuse treatment facilities (dormitory setting).

Facility C is the only Level IV maximum-security facility that houses Level IV GP

inmates.  Facility C consists of eight housing buildings, designated C-1 through C-8.  Plaintiff

was housed in Building C-7.  Buildings C-1 through C-4 are separated by a wall from buildings

C-5 though C-8.  Each group of four housing buildings are arraigned in the 180° design.

From 2004 to 2005, approximately 1200 inmates were confined in Facility C.   Buildings

C-1 to C-8 housed 1000 GP inmates.  The gymnasium housed 200 Level II inmates.

Each housing building is divided in three sections of cells (A, B, and C) arraigned

in 180°, with two tiers.  In Building C-7, all three sections consist of 120-128 prisoners.  Facility

C has two large recreation exercise yards, which are divided by a wall.  Recreation Exercise Yard

#1 (Lower Yard) is for the inmates who are housed in Buildings C-1 through C-4.  Recreation

Exercise Yard # 2 (Upper Yard) is for the inmates who are housed in Buildings C-5 through C-8.

These two large recreation yards both contain:  a basketball court with two baskets, a baseball

diamond, an area to play soccer with two soccer goals, a sand volleyball court and net, a handball

court, a running track, four sets of chin-up and dip bars, several tables with seats, drinking fountains, urinals, toilets, and sinks.  Each housing building has a small, walled area, in a wedge shape of approximately 2400 square feet.  These small yards have no recreation equipment and accommodate only 10 to 20 prisoners at a time.  They were intended for SHU inmates, in the event Facility C is converted to a SHU facility.  Facility C has not been converted to a SHU facility, so these yards have never been used for SHU inmate exercise.

During a lockdown, inmates were not permitted outdoor exercise in the main yard, the small yards, or in any other area of SATF, because the risk of violence and injury was too great to permit it.  During a lockdown, the small exercise yard could not be used in lieu of the main yard, because devoting custodial staff to escorting and supervision of inmates released to the small yards 10 to 20 at a time would have impeded and delayed investigations identifying instigators of the violence, thereby lengthening the time that all Facility C inmates would be deprived of exercise on the main yard.

### 3. Modified/Normal Program

Before 1998, it was common to have all housing buildings in a facility released to yard at the same time.  However, the number of large scale inmate riots, violence perpetrated against prison staff, and other violent incidents increased, making this practice too dangerous to continue.  When they attempted to intervene in violent incidents, staff were subjected to intimidation, harassment, and at times, assault.  Allowing all SATF Facility C inmates simultaneous access to the exercise yard resulted in the untenably dangerous situation of having 1,200 prisoners out of their cells at once.  It also allowed warring gangs to be simultaneously present in the yard and almost certainly resulted in violence and/or riots.  For the safety of the prisoners and the staff, the practice of releasing all units in a facility to the yard at the same time was stopped.

Subsequently, inmates were released to the exercise yard for recreation by housing building and cell fed which initially was called "modified program."  Because each housing building consists of approximately 128 inmates, and because known enemies and warring gangs are not housed in the same building, the modified program resulted in a much safer yard for both

prisoners and staff.  This modified program went into effect after the murder of an inmate on March 27, 2003 by two gang members and was the normal program of operation ("Normal Program") in the GP during the time Plaintiff was at SATF – January 13, 2004 to June 5, 2005.

Under Normal Program, GP inmates in Facility C were allowed to attend work and educational programs (if assigned); had regular visiting, canteen and telephone privileges; attended religious services; and had access to the law library and the day-room.  Also, these inmates were released to the exercise yard and day-room for recreation by housing building according to an established yard and dayroom schedule.

The established yard and day-room schedule provided two days a week for yard and one day a week for day-room for inmates classified as A2B.  Inmates who were "Involuntarily Unassigned" for work or training under Cal. Code Reg. tit. 15, section 3044(b)(3) were classified as A2B.  Inmates who had work or training assignments under Cal. Code Reg. tit. 15, section 3044(b)(2) were classified as A1A.  A2B inmates did not get yard or day-room on the weekends or holidays because A1A inmates had weekday jobs such that they could not use the day-room or yard during the week.  Another reason the A2B inmates did not have yard and day-room on weekends and holidays was that Facility C had less staffing (by at least ten officers) on weekends and holidays.

During Normal Program, A2B inmates received five hours a week yard-time, (two and a-half hours, two days a week) and one hour a week day-room, for a total of six hours of out-of-cell time each week, not including religious services, law library, and telephone use.

Yard and day-room sessions were divided between morning and afternoon sessions.  Yard and day-room schedules were drawn up to allocate these sessions among the various housing buildings.  For example, housing Building C-7 could be allocated morning yard on Tuesdays, afternoon yard on Thursdays, and afternoon day-room on Fridays.  The written schedules were sometimes interrupted by lockdowns, fog or other inclement weather, incidents on the yard, emergency counts, or other safety considerations.  The written yard schedules were frequently updated and were not archived.  The most accurate way of tracking an inmate's actual yard and day-room time was by the C-7 Housing Unit Officer Logbook (Yard Log) and the C-7 Control

Booth Officer Logbook (Control Booth Log).  These logbooks recorded the days and hours that each housing building was released to, and recalled from, yard or day-room.

Normal Program, under which Plaintiff and similarly classified inmates received five hours a week yard-time, (two and a-half hours, two days a week) and one hour a week day-room, for a total of six hours of out-of-cell time each week, not including religious services, law library, and telephone must be examined under both the objective and subjective elements of a claim for deprivation of exercise in violation of the Eighth Amendment.

### a.    Objective Element - Sufficiently Grave Condition

As previously stated, there is no bright line in terms of how many hours of out-of-cell exercise per week satisfy the Constitution.  However, some guidance can be gleaned from various cases in this Circuit.  *See* Noble, 646 F.3d 1138 (qualified immunity granted where no outdoor exercise or other privileges for approximately fifteen months during and after a declared state of emergency in response to a major riot); Hebbe, 627 F.3d at 343-44  (inmate impermissibly required to choose between exercise and law library access during the eight hours a week permitted out of his cell); Thomas, 611 F.3d at 1151-52 (no out-of-cell exercise for thirteen months and twenty-five days found sufficiently serious to constitute a valid claim under the Eighth Amendment); Pierce, 526 F.3d at 1211-13 (holding that ninety minutes of exercise per week is not sufficient for inmates in administrative segregation who spend the bulk of their time inside their cells, but upholding (as corrective of that violation) the lower court's order requiring jail officials to allow those inmates to exercise at least two days a week for at least two hours total per week); Lopez, 203 F.3d at 1132-33 (six week prohibition on outdoor exercise was sufficiently serious to meet the objective requirement of an Eighth Amendment claim); May, 109 F.3d at 565-66 (twenty-one day denial of outdoor exercise while inmate in disciplinary segregated housing, without medical effects, was not a substantial deprivation of exercise); Allen, 48 F.3d at 1087 (in-cell confinement for almost twenty-four hours a day and forty-five minutes of outside exercise per week for a six-week period is an objectively serious deprivation); LeMaire, 12 F.3d at 1457-58 (no out-of-cell exercise for most of a five-year period is an objectively serious deprivation); Spain, 600 F.2d at 199 (fewer than five hours of exercise per

week and no outdoor exercise for some inmates over a period of years is a constitutional violation).

Further, "other courts have held that detainees who are held for more than a short time and spend the bulk of their time inside their cells are ordinarily entitled to daily exercise, or five to seven hours of exercise per week, outside their cells." Pierce, 526 F.3d at 1212 (*citing* Campbell v. Cauthron, 623 F.2d 503, 507 (8th Cir.1980) (holding that pre-trial detainees are generally entitled to one hour of exercise outside their cells daily if they spend more than sixteen hours in their cells); Housely v. Dodson, 41 F.3d 597, 599 (10th Cir. 1994) (overruled on other grounds by Tucker v. Graves, 107 F.3d 881 (10th Cir. 1997) (" 'a failure to provide inmates (confined for more than a very short period . . . ) with the opportunity for at least five hours a week of exercise outside the cell raises serious constitutional questions' ") (*quoting* Davenport v. DeRobertis, 844 F.2d 1310, 1315 (7th Cir.1988) (addressing inmates in segregated housing)).

### (1)    In General

When compared to the circumstances in the cases just delineated, Normal Programming, which was implemented to allow general population inmates classified like Plaintiff (A2B) to be out of their cells at least six hours per week: five hours a week (divided evenly between two days) for outdoor yard and one hour a week for dayroom activities (*see* Doc. 79, DUF 25), is not, in and of itself, a sufficiently grave condition to meet the objective element of a claim under the Eight Amendment.  Defendants' evidence shows that, as of the time that Plaintiff was confined in SATF, Normal Programming allowed Plaintiff to be out of his cell at least six hours per week: five hours a week (divided evenly between two days) for outdoor yard and one hour a week for dayroom activities.  (*See* Doc. 79, DUF 25.)  This meets Defendants' burden on the issue of Normal Programing sufficiently to shift the burden to Plaintiff.  Plaintiff argues that the conditions of confinement he experienced did not equate to those outlined under Normal Program and that Normal Program did not allow him the time out of his cell that he was entitled to under California Code of Regulations section 3343(h).

### (2)    As Experienced by Plaintiff

Plaintiff generally alleges in the 2nd AC that he was confined to his cell 23-1/2 to 24

hours a day.  (Doc. 26, 2nd AC, pp. 5-6.)

Plaintiff previously stated he did not record or even keep general track of lockdowns or yard time.  (Doc. 79, DUF 70, *citing* Plntf. Depo 35:2-23.)  In contrast, Plaintiff now asserts that he kept "mental notes and distinctly recall[s] that [he] was not afforded the minimum amount of outdoor exercise/recreation of at least one hour a day, or two hours every other day for a minimum of eight hours a week or the three times a week for a minimum of ten hours a week." (Doc. 113, PDF 70, *citing* PSFR 19.)  This statement is not, in and of itself, evidence since Plaintiff did not verify the PDF.[9]  (Id.)  Further, in PSFR 19, Plaintiff states that the modified program and rotating yard schedule denied him the "minimum required outdoor exercise/yard time of one (1) hour a day, two (2) hours every other day for a minimum of eight (8) hours a week, or three (3) times a week for a minimum of ten (10) hours a week[10] and [that he] was subject to extended and excessive lockdowns" and that the PSRs "give a brief but not complete account of some, but not all [of] lockdowns."  Plaintiff then cites to Exhibit VIII, which is the PSRs which, as attached to the PSFR, is found at pages 40-50 of Doc. 109-2, all of Doc. 109-3, all of Doc. 110, and pages 1-14 of Doc. 110-1; and, as attached to the PDF, is found at pages 162-200 of Doc. 114, pages 1-100 of Doc. 115, and pages 1-12 of Doc. 116.  Plaintiff provides neither an explanation, nor further evidence to show that Exhibit VIII is incomplete or to show inaccuracies in either the set of PSRs submitted by Defendants (Docs. 82-3 through 82-5), or Associate Warden Wan's abstract or summary of the C-7 Yard and C-7 Control Log.  Thus, PDF 70, based on PSFR 19, does not raise a dispute or otherwise show that Plaintiff's purely mental recollection is sufficient to dispute Defendants' evidence quantifying the time Plaintiff was confined to his cell on a given week.

Further, Plaintiff's contention that he was confined to his cell "on average" 23-1/2 to 24 hours a day is not based on any numeric calculation, but is just a "guesstimate."  (Doc. 79, DUF

---

[9] Even if Plaintiff verified the PDF, his contradictory deposition testimony on this point would prevail. Block v. City of Los Angeles, 253 F.3d 410, 419, n. 2, (9th Cir. 2001) *ref.* Radobenko v. Automated Equip. Corp., 520 F.2d 540, 544 (9th Cir. 1975).

[10] As discussed in the following section, this is the minimum out of cell time for SHU inmates as provided by C.C.R. § 3343(h), but is inapplicable here since Plaintiff was a GP inmate.

71, *citing* Plntf. Depo 50:2-25; 51:1-23.)  Plaintiff attempts to dispute this fact by admitting that this statement "is not based on any mathematical calculations," but arguing that "the record supports that [he] was not provided, or even scheduled to receive the minimum required mandate of outdoor exercise/recreation of one hour a day, or two hours every other day for a minimum of eight hours a week or the three hours a week for a minimum of ten hours, and as such by reasonable deductions this would demonstrate that [he] was confined to [his] cell for about 23 ½ to 24 hours a day regularly for extended periods from January 2004 to May 2005."[11]  (Doc. 113, PDF 71, pp. 41-42, *citing* PSFRs 11, 19, 20, 21.)  As just previously discussed, PSFR 19 is insufficient to create a dispute of fact.  *See* supra p. 24.

PSFR 11 does not state anything regarding the length of time Plaintiff was confined to his cell; rather in it Plaintiff states that he filed several inmate appeals regarding being confined to his cell and references "Ex. 'XVI' A&B."  Neither the copy of Ex. XVI attached to the PDF, nor that attached to the PSFR, contain subsections labeled "A," "B," or "A&B."  Ex XVI to the PDF and the PSFR contain copies of the minutes of meetings between staff and inmates regarding programming.  (Doc. 112, Ex. XVI to PDF, pp. 97-105, Doc. 113-1, Ex. XVI to PSFR, pp. 125-134.)  Neither of the sets of documents submitted as Ex. XVI, nor PSFR 11 show that Plaintiff's contention that he was confined to his cell "on average" 23 ½ to 24 hours a day is based on a numeric calculation or a contemporaneous recording of events.  Thus, Plaintiff does not raise a dispute to the fact that his contention that he was confined to his cell "on average" 23 ½ to 24 hours a day  is nothing more than a "guestimate" as submitted by Defendants in DUF 71.

PSFR 20 states that "Daily log reports for H.U. 7 show that from January 2004 to May 2005 that [sic] while Plaintiff was housed at STAF for approximately five hundred and eight (508) day [sic] was confined to [his] cell for approximately four hundred and fourty [sic] seven (447) days."  (Doc. 109, PSFR 20, *citing* "Ex. 'IX.'") This statement neither explains how the records attached as "Ex. 'IX'" "show" the amount of days Plaintiff was confined to his cell, nor any basis thereon for Plaintiff to assert such a fact.  Ex. IX to the PDF is found at pages 15-70 of

---

[11] Once again, Plaintiff errantly relies on the exercise schedules set by C.C.R. § 3343(h) which is applicable to SHU inmates.

Doc. 110-1, pages 1-55 of Doc. 110-2, pages 1-75 of Doc. 111, and pages 1-27 of Doc. 111-1. Ex. IX to the PSFR is found at pages 13-101 of Doc. 116, pages 1-75 of Doc. 117, and pages 1-56 of Doc. 118.  PSFR 20 does not raise a dispute to DUF 71 as, despite the volume of documents referred to therein, Plaintiff fails to cite to particular portions of the documents that support his opposition, and does not set forth arguments explaining how the documents submitted as Ex. IX supports the arguments and allegations made in his brief.  *See* Carmen, 237 F.3d at 1029.  Further, though the PSFR is verified, Plaintiff fails to show that PSFR 20 is made on his personal knowledge, or to give any explanation to cause the blanket submission of the documents in Ex. IX and his summary statement in PSFR 20 to supercede his deposition testimony upon which DUF 71 is based.

In PSFR 21, Plaintiff provides a chronology of the dates he was confined to his cell and cites to Exhibit X – which as attached to the PSFR, is found at pages 28-48 of Doc. 111-1, and is attached to the PDF at pages 57-76 of Doc. 118.  In PSFR 21, Plaintiff states that his cell confinement included, but was not limited to the segments of time he listed, but he once again neither explains how the dates are incomplete, nor contradicts the dates and explanations provided in support of this motion via Defendant Wan's declaration and exhibits which are found at Docs. 82 through 82-6.  (Doc. 109, PSFR 21, p. 7.)

Thus, Plaintiff fails to meet his burden as he does not establish by admissible evidence that (aside from lockdowns which will be subsequently discussed) he did not receive time out of cell as scheduled under Normal Program.  Accordingly, Normal Program as experienced by Plaintiff did not present a sufficiently grave condition to meet the objective element of a claim under the Eight Amendment and Defendants are entitled to summary judgment on this aspect of Plaintiff's claims against them.

### (3)     C.C.R. Sect. 3343(h)

In his opposition, Plaintiff repeatedly states that he did not receive ten hours a week of outside exercise and/or recreation yard.  (Doc. 109, PSFR 13, p. 5; Doc. 113, PDF, pp. 12, 16-18, 41-42.)  Plaintiff apparently bases such assertions on California Code of Regulations section 3343(h) which provides that "[i]nmates assigned to special purpose segregation housing" (i.e.

SHU, or ASU) are to receive "a minimum of one hour per day, five days a week, of exercise outside their rooms or cells unless security and safety considerations preclude such activity. When special purpose segregated housing units are equipped with their own recreation yard, the yard periods may substitute for other out of cell exercise periods, providing the opportunity for use of the yard is available at least three days per week for a total of not less than 10 hours a week." Section 3343(h) clearly states that it applies to SHU inmates, not GP inmates.

SATF's C housing buildings have a small, walled, wedge shaped area which were intended for use by SHU inmates if Facility C was converted to a SHU facility. (Doc. 79, DUF 20, p. 5.) Yet Facility C has not been converted to a SHU facility, so these yards have never been used for SHU inmate exercise. (Id.) However, even if such yards were used for SHU inmate exercise, it is of no consequence since Plaintiff admits that, at all relevant times, he was a general population inmate. (Doc. 79, DUF 9; Doc. 113, PDF 9, p. 4, *citing* PSFRs 8, 9.) Thus, since housed in the general population and not in segregated housing, the requirements of section 3343(h) did not apply to Plaintiff. Even if applicable, section 3343(h) is not a rigid absolute as it provides that the hourly requirements for exercise outside of cells for segregated housing inmates applied "unless security and safety considerations preclude such activity." Accordingly, Plaintiff's arguments that Defendants were remiss for not providing him with a minimum amount of hours out of his cell every week fail to establish a sufficiently grave condition to meet the objective element of a claim under the Eight Amendment.

Normal Program, and it's application to Plaintiff under which he and similarly classified inmates were scheduled to receive five hours a week yard-time (two and a-half hours, two days a week) and one hour a week day-room, for a total of six hours of out-of-cell time each week, not including religious services, law library, and telephone does not constitute a sufficiently serious deprivation of Plaintiff's rights under the Eighth Amendment to meet the objective element of his claim.

### b.   <u>Subjective Element - Deliberate Indifference</u>

However, limited to the resolution of this motion, even if it is assumed without deciding that the deprivation at issue was sufficiently grave to satisfy the objective element of an Eighth

1   Amendment claim, the subjective element of Plaintiff's claim is not met.

2       Lawful incarceration brings about the necessary withdrawal or limitation of many

3   privileges and rights.  Bell, 441 U.S. at 545-46 (citation and quotation marks omitted); *also*

4   Hudson v. Palmer, 468 U.S. 517, 524 (1984).  It is well-established that the problems that arise in

5   the day-to-day operation of a corrections facility are not susceptible of easy solutions and prison

6   administrators should be accorded wide-ranging deference in the adoption and execution of

7   policies and practices that in their judgment are needed to preserve internal order and discipline

8   and maintain institutional security.  Bell, 441 U.S. at 545-46; *also* Whitley v. Albers, 475 U.S.

9   312, 321-22 (1986); Rhodes, 452 U.S. at 348-51; Noble, 646 F.3d at 1143; Norwood, 591 F.3d at

10  1066.

11      A prisoner's right to outdoor exercise is neither absolute and indefeasible nor does it

12  trump all other considerations.  Norwood, 591 F.3d at 1068.  Prison officials have a duty to

13  ensure the safety and security of inmates and staff and this imperative must be balanced against

14  other legal obligations, including outdoor exercise.  Id. at 1069.  Prison officials have a right and

15  a duty to take the necessary steps to reestablish order in a prison when such order is lost, id., and

16  they are entitled to wide-ranging deference in their discharge of this responsibility, so long as that

17  deference does not manifest deliberate indifference or an intent to inflict harm, Noble, 646 F.3d

18  at 1143.

19      Defendants' evidence shows that Normal Program was implemented out of safety and

20  security concerns which arose from a number of large scale riots and violent incidents against

21  both staff and inmates and culminated in an inmate's murder.  (Doc. 79, DUF 22.)  The Court is

22  not in the position to lightly second-guess the expert judgment needed to make these decisions,

23  Norwood, 591 F.3d at 1069, or otherwise micromanage prisons, Noble, 646 F.3d at 1143, 1147.

24      As previously discussed, *see* supra Part VI.B.3., Defendants evidence shows that, before

25  1998, when all housing buildings in a facility were released to yard at the same time

26  (approximately 1,200 inmates), there were a number of large scale inmate riots, violence

27  perpetrated against the staff, and other violent incidents increased which made this practice too

28  dangerous to continue.  (Doc. 79, DUF 22.)  This practice allowed warring gangs to be present in

the yard at the same time which almost certainly resulted in violence, or a riot.  (Id.)  Staff who

attempted to intervene in violent incidents were subject to intimidation, harassment, and at times,

assault.  (Id.)  Normal Program was implemented for the safety of the prisoners and the staff

subsequent to the murder of an inmate on March 27, 2003 by two gang members.  (Id.)

Plaintiff objects to Defendants' evidence arguing that they have not been qualified as

expert witnesses, which as previously discussed, is overruled.  *See* supra Part III.B.2..  Plaintiff

also argues that, "before any prisoner is cleared for or placed in G.P. all prisoners are subject to a

stringent and thorough review before a Initial Classification Committee (I.C.C.) for review and

consideration of the prisoners [sic] Central File and review and consideration of any and all

security, or safety concerns."  (Doc. 113, PDF 22, *citing* PSFR 8.)  In PSFR 8, Plaintiff states that

"[t]he Classification Committee must assign a custodial classification to each prisoner in

accordance with custody classification proscribed by the Department" and that "the senior

custodial officer . . . may temporarily increase the custody classification of a prisoner at any time

. . . necessary to protect the safety and good order of the institution."  (Doc. 109, PSFR 8.)

Plaintiff further states that this increase is "subject to classification review at the next regular

meeting per C.C.R. 3272 and that at all times [he] was assigned to General Population (G.P.)

with no known enemies housed on the same yard or same housing unit (H.U.s). . . ."  (Id.)  In

PSFR 8, Plaintiff cites to "Ex 'IV' (a) & C.C.R. 3378."  (Id.)  Exhibit IV to the PSFR contains no

documents.  (Doc. 109-2, p. 3.)  Exhibit IV to the PDF contains a copy of Plaintiff's

Classification Review Form which, contrary to Plaintiff's assertion, actually notes that Plaintiff

had known enemies and does not indicate that none of Plaintiff's known enemies were housed on

the same yard or same housing unit.  (Doc. 114, p. 102, ("Enemies: Yes, Noted on CDC 812.").)

While a copy of C.C.R. § 3378 is contained in Exhibit III to the PSFR, it is more than two pages

of single spaced, double columned, small font material addressing "Documentation of Critical

Case Information."  (Doc. 109-1, PSFR Ex. III, pp. 15-17.)  Plaintiff does not indicate his basis

for asserting, and the Court is unable to ascertain any basis to find, that C.C.R. § 3378 disproves

the facts asserted by Defendants' underlying the implementation of Normal Program (DUF 22).

Defendants have met their burden to show that Normal Program was implemented due to

safety and security concerns and not in deliberate indifference in violation of the Eighth

Amendment.  Plaintiff has not met his burden to establish the contrary such that Defendants are

entitled to summary judgment ond this aspect of Plaintiff's claims against them.

### 4.   __Lockdowns – General Information__

The suspension of normal operations of a prison is commonly called a "lockdown,"

because all, or a portion, of the inmate population are confined to their cells.  (Doc. 79, DUF 27.)

When an institution is placed on lockdown, status reports are issued and circulated which outline

information concerning the plan of operation for that day, or the next few days.  (Id.)  These

reports are called Program Status Reports ("PSRs") and include notification to both staff and

inmates.  (Id.)  These PSRs are generated until the time that the institution, or the specific

facility, that is on lockdown returns to Normal Program.  (Id.)

Between January 29, 2004 through June 4, 2005, PSRs were issued for C-Facility at

SATF.  (Id., at DUF 28.)  The PSRs identify what type of program is available to the inmates,

note the event that precipitated the lockdown or program modification, and identify what areas

and inmates are affected.  (Id.)  The PSRs also specify whether inmates must be escorted and

whether they have access to the day room, recreation yard, canteen, visits, and phone calls. (Id.)

Plaintiff attempts to oppose this fact (DUF 28) by arguing that the PSRs were not issued

to GP inmates who were generally not notified of program changes and that various activities

would be cancelled, suspended, or terminated without notice.  (Doc. 113, PDF 28 *citing* PSFR 53

*citing* PSFR 13 -- which states Plaintiff filed an administrative appeal (602) that not being

afforded at least ten hours out of his cell per week created a hostile and frustrating living

environment, referencing Ex. V, A & B at Doc. 114, pp. 104-155.)  This evidence does not raise

a dispute of fact as Defendants' statement of fact states neither that PSRs were distributed to GP

inmates, nor that they were notified of program changes.  (Doc. 79, DUF 28.)

Further, Plaintiff argues that the PSRs were inaccurate since he was subjected to cell

feeding during all relevant times.  (Doc. 113, PDF 28 *citing* PSFR 40 which states a number of

changes to rules within the California Code of Regulations that have gone into effect since 1995

*citing* a copy of various code sections submitted in Ex. III in Doc. 114, pp. 32-99 and Doc. 109,

p. 8 through Doc. 109-2, p. 2.)  DUF 28 does indicate that Plaintiff was not subjected to cell feeding, so Plaintiff's response in that vein is misdirected.  Further, PDF 28 and PSFR 40 do not raise a triable issue of fact since, even if one of the code sections Plaintiff lists required he not be subjected to cell feeding, "a violation of state . . . law can serve as the basis of a [S]ection 1983 action '[w]here the violation of state law causes the deprivation of rights protected by the Constitution.' " Hallstrom v. City of Garden City, 991 F.2d 1473, 1482 (9th Cir. 1993) (*quoting* Draper v. Coombs, 792 F.2d 915, 921 (9th Cir.1986) (*quoting* Wirth v. Surles, 562 F.2d 319, 322 (4th Cir.1977), cert. denied, 435 U.S. 933 (1978))).  In other words, where violation of state law does not cause a deprivation of rights protected by the Constitution, a mere violation of that state law is not, in and of itself, actionable under Section 1983 for violation of a federal constitutional right.

When a disturbance or an incident of violence occurs, the first actions taken are those necessary to end the disturbance and to provide medical treatment to those who are injured.  (Id., at DUF 29.)  Administrative staff, including, but not limited to, the Warden, the Administrative Officer of the Day, the Captain and the Regional Administrator are notified.  (Id.)  All necessary paperwork is then completed, which may include documentation necessary to confine inmates to administrative segregation, as well as reports of the staff observing or involved in the control of the incident.  (Id.)

After a lockdown is imposed, an investigation of the incident(s) is initiated to determine the cause of the disturbance and to assist in determining whether it is safe to release inmates from lockdown status.  (Id., at DUF 30.)

Plaintiff attempts to oppose this fact (DUF 30) by arguing that all "C" Facility GP inmates were locked-down, regardless of the incident or disturbance even though "all incidents and or disturbances at SATF "C" Facility were limited to single unit housing buildings and were isolated and spontaneous.  (Doc. 113, PDF 30, *citing* Doc. 109, PSFRs 19, 21.)  As previously discussed, neither PSFR 19 nor 21 are sufficient to create a factual dispute.  *See* supra Part VI.B.3.a.(2).  Citing PSFR 54, Plaintiff also argues that the lockdowns imposed at SATF "C" Facility from January 2004 to May 2005 were an over-exaggerated response by Defendants.

(Doc. 113, PDF 30, p. 22.)  However, PSFR 54 also does not create a factual dispute as it merely reiterates this statement, refers generally to cases Plaintiff cited in his opposing memorandum of points and authorities, and does not contain any admissible evidence.  (Doc. 109, PSFR 54, p. 17.)

All inmates in the area in which the lockdown is imposed are interviewed.  (Id., at DUF 31.)  All cells and common areas are searched.  (Id.)  Members of the Men's Advisory Council (MAC reps.-- elected inmate representatives) are interviewed to both develop and substantiate information.  (Id.)  Central files are reviewed to verify information.  (Id.)  When the investigation is complete, it is the responsibility of the Captain to develop a plan for releasing inmates from lockdown status.  (Id.)  Plaintiff does not specifically contradict DUF 31, but rather states that he was not personally among those interviewed before inmates were released from lockdowns. (Doc. 113, PDF 31.)  The fact that Plaintiff was not interviewed does not amount to a factual dispute, particularly since Defendants' evidence does not indicate that every inmate was interviewed, but rather that MAC reps were interviewed and Plaintiff does not submit any evidence that he was a MAC rep.  Further, while Plaintiff cites to PSFR 51 as supportive of PDF 31, PSFR 51 does not contain or refer to any evidence.  PSFR 51 states that interviews were not conducted with prisoners effected by the lockdowns prior to release or reinstatement of limited services and states that "[t]hreat assessments and interviews were conducted only when there was an incident, or alleged planned attack on staff" (emphasis in original).  Plaintiff neither asserts, nor submits any evidence to show that he was a MAC rep who should have been interviewed. Rather, his statement in PSFR 51 is consistent with Defendants' DUF 31 and does not create a dispute of fact.

Two officers require at least thirty minutes to thoroughly search one cell.  (Id., at DUF 32.)  While it may take anywhere from 15 to 20 days to complete a search of Facility C, this time may be significantly extended if during the search critical information is discovered necessitating further searches.  (Id.)

In PDF 32, Plaintiff attempts to dispute that it takes thirty minutes to search a cell -- DUF

32.  Therein, Plaintiff cites to PSFR 11 and "3190(c)."   In PSFR 11, Plaintiff does not state anything regarding the length of time required to search a cell; rather, in it, Plaintiff states that he filed several inmate appeals regarding being confined to his cell and references "Ex. 'XVI' A&B."  As previously noted, *see* supra Part VI.B.3.a.(2), neither the copy of Ex. XVI attached to the PDF, nor that attached to the PSFR, contain subsections labeled "A," "B," or "A&B."  Ex XVI contains copies of the minutes of meetings between staff and inmates regarding programming.  (Doc. 112, Ex. XVI to PDF, pp. 97-105, Doc. 113-1, Ex. XVI to PSFR, pp. 125-134.)  Section 3190(c) of Title 15 merely states that "the combined volume of state-issued and allowable personal property items shall not exceed six cubic feet. . . ."  It does not address the length of time needed to adequately search a cell.  Neither of the copies submitted as Ex. XVI, nor PSFR 11 show any basis to dispute that it takes at least thirty (30) minutes to thoroughly search one cell or from 15 to 20 days to search Facility C as submitted by Defendants in DUF 32.

If the violence is gang related or racially motivated, the lockdown may be limited to a particular ethnic group, housing building, or gang.  (Id., at DUF 33.)  When possible, lockdowns were narrowly applied to the particular gang, racial group, or housing building causing the violence.  (Id.)

Plaintiff attempts to dispute that lockdowns were imposed narrowly to particular gangs, racial groups, or housing unit (DUF 33) by arguing:  that Defendants imposed highly restrictive modified program upon all GP inmates even after Defendants had identified particular groups of prisoners who were disruptive or involved in a particular incident; that implementation of the modified program, which was Normal Program when Plaintiff was housed at SATF, was based on an "out dated incident that Defendants identified as involving a specific group of prisoners;" that it was common for Defendants to "impose modifications and/or lockdowns upon the entire GP prisoners even where and when they identified specific groups and even where and when Defendants knew that the incident or disruption was limited to, or involved, a specific housing unit/building."  (Doc. 113, PDF 33 *citing* PSFRs 19, 21.)  PDF 33 does not contain any evidence to support these assertions by Plaintiff and, as previously discussed, PSFRs 19 and 21 are

insufficient to create a dispute of fact. *See* <u>supra</u> Part VI.B.3.a.(2).

The investigative process, and the process of releasing inmates from a lockdown, can include individual and group interviews with all inmates. (<u>Id.</u>, at DUF 34.)  It can also include the release of inmate "representatives" for the purpose of allowing them to speak with other inmates about the lockdown and any ongoing disputes between various ethnic groups. (<u>Id.</u>) Other efforts may include attempts to mediate any underlying dispute among the inmate groups. (<u>Id.</u>)

Plaintiff attempts to dispute DUF 34 by arguing that the lockdowns imposed during the times in dispute in this action and Defendants' investigation measures of the entire GP population were an exaggerated response to incidents since Defendants "knew that the incident involved a specific individual/group/housing unit." (Doc. 113, PDF 34, *citing* PSFR 54.)  PDF 34 does not contain any evidence to support this assertion by Plaintiff and, as previously discussed in this section, PSFR 54 is insufficient to create a dispute of fact as it does not contain any admissible evidence.

During the lockdown, in addition to being occupied with efforts to investigate and identify the instigators of the violence, custodial staff have to conduct a greater-than-usual number of searches for weapons and other contraband and have to escort inmates to showers and the medical clinic, which was not required under ordinary conditions. (<u>Id.</u>, at DUF 35.)

Plaintiff states that he disputes DUF 35 and argues that Defendants "do not produce any documentation to show or support that the incident identified during relevant times extended, or involved other housing units/buildings or the whole GP which would justify imposing institutional lockdowns or require investigation of the entire GP" (Doc. 113, PDF 35.) However, Defendants submit Defendant Wan's declaration which specifically states this paragraph verbatim. (Doc. 82, Wan Decl., ¶ 32.)  Plaintiff does not submit any evidence to contradict this statement to raise a dispute as to this statement of fact.

### 5. <u>Specific Lockdowns</u>

#### a. <u>Defendants' Facts</u>

34

Defendants submitted evidence which shows that even though there were multiple lockdowns during Plaintiff's tenure at SATF, the longest single lockdown lasted twenty days – from July 7, 2004 through July 26, 2004.  (Doc. 82-1, Attach. #1 to Wan Decl.)  In May, 109 F.3d at 565-66, the Ninth Circuit held that a twenty-one day denial of outdoor exercise to an inmate, who was housed in disciplinary segregated housing, who did not have medical effects, did not amount to a substantial deprivation of exercise.

Defendants' evidence further shows that Plaintiff was housed with a cell-mate in the general population at SATF – not segregated housing.  (Doc. 79, DUFs 8-10.)  Inmates in segregated housing do not get yard or day-room with other inmates, do not have cell-mates, do not have radio or television in their cells, and thus have much less social contact and more sensory deprivation than general population inmates.  (Id., DUF 72, *citing* Wan Decl. ¶ 36.)

### b.      **Plaintiff's Opposition**

Plaintiff does not submit any evidence to address the actual length of any given lockdown; rather, as previously discussed, he contends "that [he] was confined to [his] cell for about 23 ½ to 24 hours a day regularly for extended periods from January 2004 to May 2005." (Doc. 113, PDFs 70, 71, *citing* PSFRs 11, 19, 20, 21.)  However, as previously discussed, PDFs 70 and 71 and PSFRs 11, 19, 20, and 21 are insufficient to create a factual dispute.  *See* supra Part VI.B.3.a.(2).

Plaintiff admits that he was housed with a cell-mate in the general population at SATF – not segregated housing.  (Doc. 113, PDFs 8-10.)  While Plaintiff also admits that segregated housing unit prisoners do not get dayroom by themselves or with other prisoners, he attempts to dispute the remainder of DUF 72.  (Doc. 113, PDF 72 *citing* PSFRs 28, 29, 31.)

In PSFR 28, Plaintiff states that it is standard state policy that "ASU/SHU prisoners are allowed yard, visitations, state clothing, reading material, legal work, meals in their cells, required to accept cell-mates, canteen, appliances, law library, etc., contrary to what Defendant(s) claim."  (Doc. 109, PSFR 28 *citing* "Ex. 'III' 3044(g), 3190(j)(3), 3335, 3343.")  Exhibit III to the PDF is found at Doc. 114, pp. 32-99, Exhibit III to the PSFR is found at Doc. 109-1, p. 8

1    through Doc. 109-2, p. 2.  Both Exhibit IIIs contain copies of various sections of the California

2    Code of Regulations.  Section 3044(g) addresses SHU housing and notes that such inmates are

3    not to receive family visitation, that yard access for SHU inmates is limited by local

4    institution/facility security needs and that they are to have "no access to any other recreational or

5    entertainment activities," and that they are to receive only one-fourth the maximum monthly

6    canteen draw.  Section 3190(j)(3) provides that SHU inmates may possess or acquire one

7    television or one radio or one television/radio combination unit.  Section 3335 appears

8    inapplicable as it addresses Administrative Segregation and Plaintiff does not indicate which of

9    the fifteen subsections of this code section he feels applies to dispute DUF 72.  While Plaintiff

10   underlined subsection (c) of section 3335, that subsection only addresses the requirement that an

11   inmate's placement in segregation shall be reviewed within ten days by the ICC.  Section 5343

12   addresses conditions of Administrative Segregation housing, which appear to be much less

13   restrictive than the conditions in segregated housing for disciplinary reasons.  Overall, the code

14   sections Plaintiff cites and submits appear to show that inmates in Administrative Segregation

15   are subjected to less restrictive housing conditions than those in disciplinary segregated housing.

16   Yet they do not show either differences or similarities between conditions in the general

17   population and segregated housing units.  As such, PSFR 28 does not raise a triable dispute as to

18   DUF 72.

19        In PSFR 29, Plaintiff states that "refusing to accept a cellmate and assigned housing will

20   result in a written Rule Violation Report (RVR) and disciplinary actions."  (Doc. 109, PSFR 29,

21   *citing* "Ex. 'III' 3315(5)(M)(N), 3269, 3269.1.")  Section 3315 defines what activities qualify as

22   serious rule violations.  Subsections (5)(M) and (5)(N) of this section address violations for

23   refusing to accept assigned housing and or to accept an inmate housing assignment of subsection

24   3005(c).  However, Plaintiff does not provide any basis to infer subsections (M) and (N) of

25   subsection (5) apply to inmates in segregated housing and such extension is not logically made

26   particularly in light of the fact that subsection (L) of subsection (5) specifically states that it

27   applies to "inmates placed in ASU, SHU, PSU," whereas subsections (M) and (N) contain no

28

36

such characterizations.  Section 3269 addresses inmate housing assignments and contains a number of subsections – specifically which one Plaintiff relies on is unstated and so unknown.  However, 3269(c) states ". . . [u]nless approved for single cell assignment, an inmate in ASU or SHU is expected to share a cell with another inmate."  While section 3269(c) appears to require inmates in ASU or SHU to cell with another inmate, Plaintiff does not submit any evidence to show that all inmates in ASU or SHU have cell-mates as opposed to inmates in the general population.  Section 3269.1 does not appear applicable to the differences in housing conditions for general population inmates as opposed to inmates housed in ASU or SHU as it relates to integrated housing and subsection (e) therein states, among other things, that an inmate who "refuses to be housed in appropriately determined housing, . . . shall be subject to the disciplinary process . . . and shall be considered . . . for placement in more restrictive housing such as an ASU or a SHU."  Thus, PSFR 29 does not raise a triable dispute as to DUF 72.

In PSFR 31, Plaintiff asserts that ASU and SHU inmates are "often cleared for and approved for controlled compatibility <u>group yards</u>" and that "Plaintiff/Williams has been cleared/approved for <u>group yard</u>, outdoor exercise/recreation after being placed in ASU and SHU" while housed at facilities other than SATF.  (Doc. 109, PSFR 31, *citing* "Ex.s 'XII' & 'IV' 128," (emphasis in original).)  Exhibit XII to the PDF is found at page 134 of Doc. 113 through page 8 of Doc. 113-1.  Exhibit XII to the PSFR is found at pages 17 through 31 of Doc. 112.  Exhibit XII is the chronological history of Plaintiff's transfers among state facilities.  While this document shows that Plaintiff has been housed at a variety of California prison facilities, it does not show that the conditions under which Plaintiff may have been cleared and approved for group yards at other facilities while he was housed in ASU or SHU, should or would apply to housing of ASU and SHU inmates at SATF.  As previously discussed, *see* <u>supra</u> Part VI.B.3.b., Exhibit IV to the PSFR does not contain any documents to review and that same exhibit to the PDF contains Plaintiff's classification sheet.  The Court is unable to ascertain, and Plaintiff does not provide any information and/or indication as to how he believes his classification sheet from his reception at SATF provides, a basis of dispute for DUF 72.

1    Thus, Plaintiff fails to raise a triable dispute as to DUF 72.

2    Further, while Plaintiff argues that Defendants' failure to provide him with ten hours a

3    week[12] of outdoor exercise caused him "to suffer extended and excessive cell confinement

4    headaches, dizziness, stiff/sore joints/muscles, etc." (*e.g.* Doc. 113, Opp. P&A, 60:21-28, *citing*

5    PSFR 44), as previously discussed,  Plaintiff is not a medical expert and cannot testify as to the

6    causation of his medical conditions such that PSFRs 44 and 45, in Doc. 109, are inadmissible.

7    *See* supra Part III.A.3.  Thus, Plaintiff fails to establish that any of the individual lockdowns he

8    was subjected to caused medical sequela.

9     Accordingly, since the individual segments of lockdown time were relatively brief and

10   without medical effect, none of them, individually, equate to a sufficiently serious deprivation to

11   meet the objective element of Plaintiff's claim of being deprived of exercise in violation of the

12   Eighth Amendment.

13   Next, the lockdowns which Plaintiff was subjected to while he was housed at SATF, from

14   January 2004 through June 2005, must be reviewed for cumulative effect.

15                   **6.     Cumulative Effect of Lockdowns**

16   The evidence presented by Defendants regarding the specific dates that Plaintiff, and

17   inmates like him, were on lockdown are reviewed and specific opposition raised by Plaintiff to

18   individual lockdowns is next reviewed.  However, as previously discussed, neither Plaintiff's

19   "mental notes" nor "guesstimate" that he was confined to his cell on average 23-1/2 to 24 hours a

20   day while at SATF meet his burden to establish a triable issue of fact (*see* supra Part VI., B., 3.,

21   a., (2)) and they need not be considered in this segment of discussion.

22                   **a.     Defendants' Facts**

23   Only those lockdowns affecting Black inmates in building C-7 affected Plaintiff.   (Doc.

24   79, DUF 36.)

25                   **b.     Plaintiff's Opposition**

26   ───────────────────

27   [12] As previously discussed, since he was a general population inmate, the requirement of ten hours of
     exercise per week did not apply to Plaintiff.  *See* supra Part VI.B.3.a.(3).

28

Plaintiff argues that the entire GP "C" Facility was directly and indirectly affected by all lockdowns during the time frames at issue in this action.  (Doc. 113, PDF 36, *citing* PDF 34, Doc. 109, PSFRs 19, 20, 21.)  In PDF 36, Plaintiff states that he disputes DUF 36.  However, PDF 36 does not present any admissible evidence and relies on PDF 34 and PSFRs 19, 20, and 21.  PDF 34 relies on PSFR 54 which, as previously discussed, is insufficient to raise a dispute of fact, *see* <u>supra</u> Part VI.B.4, as are PSFRs 19, 20, and 21, *see* <u>supra</u> Part VI.B.3.a.(2).

Further, Plaintiff ignores the fact that Defendants cite Plaintiff's own deposition testimony in support of the fact that he was only affected by lockdowns of black inmates in building C-7.  (Doc. 79, DUF 36, p. 9 *citing* Pl.'s Dep. 48:10-25; 49:1-20 attached to Doc. 83 as Ex. A to Douglas' Decl.)  Plaintiff's declaration does not take precedence over his responses in deposition as "[a] party cannot create a genuine issue of material fact to survive summary judgment by contradicting his earlier version of the facts." <u>Block</u>, 253 F.3d at 419, n. 2, *ref.* <u>Radobenko</u>, 520 F.2d at 544.

### c.    <u>Specific Lockdowns</u>

The lockdowns that affected Black inmates in building C-7 (i.e. Plaintiff ) between January 29, 2004 and June 4, 2005, are discussed below.  (Doc. 79, DUF 36.)

### (1)    <u>February12 & 17, 2004</u>

February 12.  The Upper Yard was locked down due to Code 1 -- mutual combat.  (<u>Id.</u>, at DUF 37.)

February 17.  Razors were lost in gym and gym searches were conducted.  (<u>Id.</u>, at DUF 38.)

### (2)    <u>March 2, 9, & 14-30, 2004</u>

March 2.  No yard was allowed due to searches.  (<u>Id.</u>, at DUF 39.)

March 9.  Facility C locked down because a kite was found; search yard and cells.  (<u>Id.</u>, at DUF 40).

March 14 through March 30.  An anonymous note was found stating that members of the Black inmate population were planning an assault on staff.  (<u>Id.</u>, at DUF 41.)  An investigation

was conducted and the identities of the inmates planning the assault were discovered.  (Id.)  A

subsequent search of the identified inmates' cells resulted in the discovery of an inmate-

manufactured deadly weapon.  (Id.) As a result of this discovery, a search was conducted of all

black inmate cells followed by a threat assessment to determine if there continues to be a threat

to the safety of staff.  (Id.)  Additionally, during these subsequent searches on March 16, 2004,

another inmate-manufactured deadly weapon was discovered.  (Id.)  Effective March 16, 2004,

all members of the black inmate population were placed on lockdown pending completion of

searches and a threat assessment.  (Id.)

During this lockdown, staff did the following:  (Id., at DUFs 42, 43.)[13]

> March 18.  Staff meeting; cell searches.

> March 20.  Grid searches.

> March 21.  Code 2, B yard all staff assist.

> March 23.  C-7 cell searches.

> March 25.  Common area searches.

> March 26.  Cell searches.

> March 29.  End lockdown.  Day-room available.

> March 30.  No Yard.  Code 1 C-5 Cell fight.

**(a)      Plaintiff's Opposition**

Plaintiff argues that the days which are not accounted for (i.e. the 19th, 22nd, 24th, 27th,

and 28th) show that Defendants delayed efforts to lift lockdowns unnecessarily and extended

lockdowns for all inmates even with specific information identifying particular inmates who

planned or were involved in an incident.  (Doc. 113, PDF 42, pp. 27-28 *citing* PSFRs 20, 21.)

However, as previously discussed, PSFRs 20 and 21 do not raise a dispute of fact.  *See* supra Part

VI.B.3.a.(2).

---

[13] Where, as here, a DUF lists various dates and occurrences, the citation to the DUF will be given after the first line indicating that dates and occurrences are to follow; rather than repeatedly citing the DUF at the end of each date line – i.e. the evidence showing prison staff activities on March 18th through March 30th are found at DUFs 42 and 43 of Doc. 79.

1          **(3)     April 13, 2004**

2          April 13.  No yard due to yard maintenance.  (Doc. 79, DUF 44.)

3          **(4)     May 20 - June 9, 2004**

4          May 20.  No program pending threat assessment (due to 5/18 assault on staff). Staff

5    meeting.  (Id., at DUF 45.)

6          May 25.  Yard Canceled; lack of yard staff.  (Id., at DUF 46.)

7          May 27, 2004 through June 9, 2004.  A group of black inmates committed the act of

8    battery on an inmate with a deadly weapon.  (Id., at DUF 47.)  A number of weapons were

9    subsequently found on the recreational yard in the areas in which the battery was committed.

10   (Id.)  Upon searching the cells of the black inmates in housing building C-6, additional weapons

11   were found in these cells.  (Id.)  Based upon these events, the black inmate population was

12   placed on lockdown.  (Id.)  After further searches and interviews of inmates and MAC reps.,

13   effective June 9, 2004, the black inmate population in housing buildings C-5, C-6, C-7, and C-8

14   returned to normal program.  (Id.)

15         During this lockdown, staff did the following: (Id., at DUF 48.)

16              May 28.  Allowed MAC Reps make rounds.  Conducted grid searches.

17              May 29.  Conducted interviews for threat assessment.

18              May 30.  Conducted cell searches.

19              June 1.  Code 1 "cell fight sticking."

20              June 3.  Staff meeting.

21         **(a)     Plaintiff's Opposition**

22         Plaintiff argues, but submits no evidentiary basis to show, that the incidents identified in

23   this paragraph show that even when "an incident was isolated to a specific building/housing unit

24   the lockdowns affected all the GP."  (Doc. 113, PDF 47, pp. 28-29.)  However, this incident

25   involved black inmates and Plaintiff admitted that he would be affected by lockdowns affecting

26   black inmates (id., at PDF 36) and he does not submit any admissible evidence to show that there

27   was no ability for communication between, and no interaction/concerted efforts between black

28

inmates in C-5, C-6, C-7, and C-8 such that those four housing units should not have been

locked-down when deadly weapons were found among black inmates housed in C-6.

(5)    July 7 - July 25, 2004

July 7 through July 25, 2004.  On July 7, 2004, security maintenance was done on all

Facility C inmate cells because it was discovered that inmates were removing their cell door

handles and hiding contraband in the cavity behind the door handles.  (Doc. 79, DUF 49.)  In

addition, it was discovered that the inmates made weapons cut from the metal plate attached to

the cell door handle.  (Id.)  Security maintenance was done to remove the cell door handles,

check the cavity, reattach door handles, and grind out the center of the attaching screws so that

the screws could no longer be removed.  (Id.)  All inmates on Facility C were placed on

lockdown until the completion of the security maintenance and search of Facility C.  (Id.)

During this lockdown, while the doors were being fixed, the staff did the following: (Id.,

at DUF 50.)

July 8.  Cell searches.

July 10.  Staff meeting.

July 10 - 13.  Cell searches.

July 15.  Cell searches.

July 16.  Cell searches and alarm checks.

July 17 - 18.  Alarm checks.

July 19.  Cell searches.

July 21 - 23.  Cell searches.

July 25.  Cell searches.

July 26.  Vector control in building.

July 29.  Day-room canceled – fresh paint (painter in building).

(a)    Plaintiff's Opposition

Plaintiff again argues that the unaccounted for days in this time frame (i.e. July 9th, 14th,

and 20th) show that Defendants unnecessarily delayed lifting the lockdowns.  (Doc. 113, PDF 50,

pp. 30-31.)  However, PDF 50 relies on PSFR 21 which, as previously discussed, *see* <u>supra</u> Part VI.B.3.a.(2), does not raise a dispute of fact.

Plaintiff also argues that Defendants "conducted unnecessary alarm checks without a showing that alarms were faulty, malfunctioning, or needed to be checked, or repaired which prolonged lockdowns."  (<u>Id</u>.)  However, this argument fails as it is both unsupported by evidence and premised on the illogical assumption that alarms need not be inspected unless there is some notice that they are not working properly – i.e. had not gone off when supposed to – which would illogically require awaiting a precipitating security breach before conducting maintenance.

### (6)  August & September, 2004

There were no lockdowns affecting Plaintiff in August and September of 2004.  (Doc. 79, DUF 51.)

### (7)  October 19 & 29, 2004

October 19.  No yard.  Staff to Gym for searches and cell searches.  (<u>Id</u>., at DUF 52.)

October 29.  Power outage; 1st watch status.  (<u>Id</u>., at DUF 53.)

### (8)  November & December, 2004

There were no lockdowns affecting Plaintiff in November and December of 2004.  (<u>Id</u>., at DUF 54.)

### (a)  Plaintiff's Opposition

Plaintiff disputes DUF 54 by stating that there were several periods of cell confinement and lockdowns between October 2004 and February 2005.  (Doc. 113, PDF 54 *citing* Doc. 109, PSFRs 20, 21.)  As previously discussed, PSFRs 20 and 21 do not raise a dispute of fact as they rely on Exhibits IX and X to both the PDF and the PSFR and Plaintiff fails both to cite to specific pages therein and to provide any explanation as to how the he extrapolated the facts he asserts from those voluminous exhibits.  *See* <u>supra</u> Part IV.B.3.a.(2).

### (9)  January 12-26, 2005

January 12 through January 26, 2005.  On January 10, 2005, the murder of a correctional officer occurred at the California Institute for Men, so a complete search of each housing

buildings and common area on Facility C was conducted.  (Doc. 79, DUF 55.)  The search was

conducted for the safety and security of Facility C.  (Id.)

>During this lockdown staff did the following: (Id., at DUF 56.)

>>January 11.  MAC reps out to notify building regarding program.

>>January 12.  Gym search.

>>January 13-14.  Cell searches.

>>January 15.  Searches.  Cell Searches B Section.

>>January 16-18. Cell searches.

>>January 19.  Staff meeting; searches.

>>January 20-26.  Searches.

>(a)    **Plaintiff's Opposition**

Plaintiff admits the facts Defendants assert in DUFs 55 and 56, but requests that judicial

notice be taken of the facts that Defendants did not offer any evidence to show that a murder of a

correctional officer at another facility caused a safety and security issue at SATF and argues that

this is an example that Defendants acted without proper authorization to impose an emergency

lockdown "disregarding state policy in an abuse of authority."  (Doc. 113, PDF 55, pp. 32-33

*citing* PSFR 54.)  "A judicially noticed fact must be one not subject to reasonable dispute in that

it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of

accurate and ready determination by resort to sources whose accuracy cannot reasonably be

questioned."  Fed. R. Evid. 201(b).  Whether sufficient evidence was submitted to establish a fact

as undisputed is not something which can be judicially noticed.  Plaintiff's request for judicial

notice is denied.

While denied, Plaintiff's request for judicial notice can be construed as an objection that

Defendants have not met their burden of supplying sufficient evidence to establish that the

murder of a correctional officer at another facility created a safety and security issue at SATF.

Yet, the evidence submitted by Defendants is sufficient in that Defendant Wan's declaration

states that: the "[l]ockdowns affecting [Plaintiff during the period of time at issue in this action]

arose from significant security threats;" "one lockdown was in order to conduct weapons

searches after a peace officer was murdered at another institution;" and "[s]afety of staff and

inmates was the motive for the lockdowns which arose from [this] security threat[]." (Doc. 82,

Wan Dec., ¶ 33.)  Given the "wide-ranging deference" prison officials are entitled to in matters

of lockdowns based  on safety and security issues and the lack of manifestation of either

deliberate indifference or an intent to inflict harm, this is sufficient evidence to establish the facts

in DUF 55.  Noble,646 F.3d at 1142-43.  Defendant Wan's declaration may be considered in

support of DUF 55 despite the lack of reference.  Fed. R. Civ. P. 56(c)(3); Carmen, 237 F.3d at

1031.  Further, PSFR 54 does not submit any evidence upon which to establish a dispute of DUF

55 since it contains nothing more than argument and merely refers to case law cited in Plaintiff's

opposition.  (Doc. 109, PSFR 54, p. 17.)

### (10)   February 1-8, 2005

On February 1, 2005, an inmate-manufactured weapon was discovered in the possession

of a MAC rep.  (Doc. 79, DUF 57.)  As a result of this discovery, an additional search was

conducted on all Facility C housing buildings for any additional weapons -- which yielded six

inmate-manufactured weapons.  (Id.)

During this lockdown, staff did the following: (Id., at DUF 58.)

February 2.  Staff meeting.

February 3 -5.  Searches.

February 5 - 6.  Staff meeting.

February 7.  Searches.

February 8.  Handcuffs missing; searches.

### (a)   Plaintiff's Opposition

While Plaintiff states that he is without sufficient information to admit or deny DUF 58,

he challenges and disputes both the "high number of staff meetings as excessive and point[s] out

that the all day meetings only serve to extend the un-necessary, unauthorized lockdown." (Doc.

113, PDF 58, p. 34, *citing* PSFR 21.)  As previously discussed, PSFR 21 does not raise a dispute

of fact as it relies on Exhibit X to both the PDF and the PSFR, and Plaintiff fails both to cite to

specific pages therein and to provide any explanation as to how the he extrapolated the facts he

asserts from either of those voluminous exhibits.  *See* supra Part VI.B.3.a.(2).

### (11)   February 17 - March 3, 2005

February 17 to March 3, 2005.  On February 17, confidential information was received

indicating a threat to several staff members on Facility C.  (Doc. 79, DUF 59.)  Due to the nature

of this information, Facility C was placed on lockdown status until the completion of a threat

assessment to determine validity of this information.  (Id.)

During this lockdown, staff did the following:  (Id., at DUF 60.)

February 18.  Planned assaults on staff.  Staff meeting.

February 19.  MAC reps out regarding lockdown.  Search program area.

February 21.  Interview inmates and sweep.

February 22.  Threat assessment interviews.  Gym search.

February 23.  Searches.  Staff Meeting.

February 24-28.  Searches.

March 1-2.  Searches.

March 3.  Lockdown ends.  Staff meeting regarding release of lockdown.

### (a)   Plaintiff's Opposition

Plaintiff admits that he is without sufficient information to admit or deny DUF 60, but

points out that Defendants do not identify what areas, units, buildings, and the like were being

searched and/or how time was utilized and argues that the lockdown was prolonged since

February 20th was not accounted for.  (Doc. 113, PDF 60, pp. 35-36, *citing* PSFR 55.)  PSFR 55

does not raise a factual dispute as it does not contain any admissible evidence; rather in it

Plaintiff argues that Normal Programming and lockdowns extended for periods of time beyond

the times allowed by standard state policy, citing "Ex III 3383."  (Doc. 109, PSFR 55, pp. 17-18.)

As previously discussed, *see* supra Parts VI.B.3.b.; 5.b., the documents contained in both Ex. III

to the PDF and to the PSFR are copies of various sections of the California Codes of

Regulations.  (Doc. 114, PDF Ex. III, pp. 32-99; Doc. 109-1, pp. 8-50; Doc. 109-2, pp. 1-2.)

Regardless, assuming that by "Ex. III 338" Plaintiff was citing to C.C.R. § 338, that code section

46

does not establish a factual dispute as it does not place a maximum on lockdown conditions and even if it did, violation of a state statute does not, in and of itself, constitute a violation of federal constitutional rights.  *See* Hallstrom, 991 F.2d at 1482.

### (12)    March 18 - 21, 2005

March 18 though March 21, 2005.  On Thursday, March 17, 2005, the discovery of contraband was made on Facility C, to wit:  inmate-manufactured weapons, suspected narcotics, and a cellular telephone with charger.  (Doc. 79, DUF 61.)  Facility C was on lockdown pending an investigation into the discovered contraband by the Investigative Services Unit.  (Id.)

During this lockdown staff did the following: (Id., at DUF 62.)

March 18.  Staff meeting; searches.

March 19.  Staff meeting.

March 20.  Staff meeting.  Search Gym; MAC reps out.

March 21.  Searches.

### (a)    Plaintiff's Opposition

Plaintiff admits that he is without sufficient information to admit or deny any discovery of contraband, but he states that this was "an isolated incident" which "did not involve the entire Facility C GP" and that he, personally, "was not said to have been involved, or associated with any of the prisoners in possession of any contraband." (Doc. 113, PDF 61, p. 36, *citing* PSFRs 19, 27.)

For the same reasons previously discussed, PSFR 19 does not raise a factual dispute to DUF 61 since Plaintiff provides neither an explanation, nor further evidence to show that Exhibit VIII is incomplete, or to show that the set of PSRs submitted by Defendants (Docs. 82-3 through 82-5) and/or that Associate Warden Wan's abstract or summary of the C-7 Yard and C-7 Control Logs were inaccurate.  *See* supra Part VI.B.3.a.(2).  Thus, PSFR 19 does not raise a dispute as to DUF 61.

PSFR 27 states that Defendants authorized and enforced a plan of operations that "denied GP prisoners less program to yard and recreational activities then [sic] those prisoners placed in administrative segregation units (ASUs) and,or [sic] security housing units (SHUs)." (Doc. 109,

PSFR 27, pp. 8-9, *citing* "'Ex. XI' D Admission.")  Whether GP prisoners received more or less "program to yard and recreational activities" than those in ASUs or SHUs appears immaterial to a lockdown due to discovery of contraband and Plaintiff provides no explanation to the contrary. Further, Plaintiff does not identify which admission from the multiple sets contained in both Ex. XI to the PSFR (Doc. 111-1, pp. 49-75; Doc. 112, pp. 1-16) and Ex. XI to the PDF (Doc. 113, pp. 92-133) he relies on.  Thus, PSFR 27 also does not raise a dispute as to DUF 61.

Further, while Plaintiff admits that he is without sufficient information to admit or deny what was done during this lockdown, he disputes and contests whether "the searching of the gym Level III prisoners is justified in [sic] extended Level IV prisoners" and argues it is a problem of prison overcrowding.  (Doc. 113, PDF 62, pp. 36-37, *citing* PSFR 48.)  PSFR 48 states that the number of prisons has grown and "given rise to a serious problem with overcrowding" resulting in a negative impact on "all aspects of prison functions, operations, services, programs, etc.," but that this does not excuse "substandard treatment and,or [sic] care of prisoners by prison officials."  (Doc. 109, PSFR 48, p. 15, *citing* "Ex. 'XV' Special Masters [sic] Report.")  Ex. XV to the PDF is found at Doc. 113-1, pp. 43-71.  Ex. XV to the PSFR is found at Doc. 112, pp. 67-96.  PSFR 48 fails to refer to specific pages within the Special Master's Report that address the facts in DUF 62 and fails to show any basis upon which the Special Master's Report applies to the activities by prison staff during the March 2005 lockdown.  Thus, the PSFR does not raise a dispute as to DUF 62.

### (13)   April 12, 2005

April 12.  No yard due to training drills; mock yard incident.  (Doc. 79, DUF 63.)

### (a)   Plaintiff's Opposition

Plaintiff argues that it was inexcusable for Defendants to conduct training drills during the limited time that prisoners have access to yard and that they are only justified to prohibit yard access when a legitimate penological interest and an actual emergency exists.  (Doc . 113, PDF 63, p. 37, *citing* PSFR 54.)  PSFR 54 does not create a factual dispute to DUF 63 since, as previously stated, *see* supra Part VI.B.4., it merely reiterates this statement, refers generally to case law Plaintiff cited in his opposing memorandum of points and authorities, and does not

1     contain any admissible evidence.  (Doc. 109, PSFR 54, p. 17.)

2                                         **(14)**   **April 13 - 19, 2005**

3          April 14 through April 19, 2005.  On April 13, 2005, an anonymous "kite" (inmate note)

4 was received stating that Southern Hispanic inmates in housing building C-2 were planning to

5 assault a named correctional officer for an unknown reason.  (Doc. 79, DUF 64.)  The note also

6 stated that the involved inmates were in possession of controlled substances and named the

7 inmates by housing and aliases.  (Id.)  Facility C was placed on lockdown pending completion of

8 an Investigative Service Unit (I.S.U.) threat assessment into the validity of the threat against this

9 correctional officer.  (Id.)  The I.S.U. conducted interviews of all inmates on Facility C.  (Id.)

10          The Building C-7 logbook entries do not reflect the ISU's interviews or investigations

11 conducted during this lockdown period.  (Id., at DUF 65.)  The ISU was working throughout the

12 lockdown period, holding inmate interviews in all housing buildings, which is not reflected in the

13 C-7 logbooks.  (Id.)

14          During this lockdown the C-7 correctional officer staff did the following: (Id., at DUF

15 66.)

16                  April 17.  Threat assessment team in building C-7.

17                  April 19.  Lockdown ends.

18                          **(a)**     **Plaintiff's Opposition**

19          While Plaintiff once again admits he is without sufficient information to admit or deny

20 whether a "kite" was received regarding an alleged planned attack on a correctional officer and/or

21 whether prisoners were in possession of a controlled substance, he argues that this situation did

22 not involve the entire Facility C GP and that the deprivation suffered by inmates during

23 lockdown is as serious as a threat to staff.  (Doc. 113, PDF 64, pp. 37-38, *citing* PSFRs 22, 54.)

24          PSFR 22 states that Defendants "acknowledge and admit that extended and excessive

25 lockdowns/cell confinement creates an extremely stressful, unhealthy and hostile living

26 environment."  (Doc. 109, PSFR 22, p. 8, *citing* "Ex 'XI' A, B, C, D Admissions.")  In and of

27 itself, an acknowledgment and/or admission that extended and excessive lockdowns/cell

28 confinement creates an extremely stressful, unhealthy and hostile living environment is not

evidence that the deprivation suffered by inmates from the five day lockdown in April was as serious as the precipitating threat to staff.  "Ex. 'XI' A, B, C, D Admissions" is a multi-paged document (found as PSFR Ex. XI at Doc. 111-1, pp. 49-75 and Doc. 112, pp. 1-16; and found as PDF Ex. XI at Doc. 113, pp. 92-133) that shows defense admissions that extended and excessive cell confinement does create a stressful, unhealthy, and hostile living environment.  However, Ex. XI to both the PDF and the PSFR shows neither that five days amounts to extended and excessive cell confinement, nor that any deprivation sustained by inmates in a five day lockdown is as serious as a threat to staff.  Thus, PSFR 22 does not create a factual dispute to DUF 64.

PSFR 54 also does not create a factual dispute to DUF 64 since, as previously stated, *see* supra Part VI.B.4., it merely reiterates this statement and refers generally to cases Plaintiff cited in his opposing memorandum of points and authorities and does not contain any admissible evidence.  (Doc. 109, PSFR 54, p. 17.)  Plaintiff also argues that since DUF 64 states that the "kite" identified a specific group, the names, aliases, and housing units/building C-2, it "shows that this was an isolated incident which [Plaintiff] had absolutely no knowledge of, or association with."  (Doc. 113, PDF 64, p. 38.)  However, Plaintiff does not submit any evidence to support this assertion and the PDF is not verified such that Plaintiff's mere statement therein does not equate to evidence to establish a factual dispute.  Further, even though Plaintiff may not have been personally implicated, he does not submit any evidence to show that it was unreasonable, or excessive, for prison officials to lock down Facility C for investigation when they received a "kite" advising of a planned assault of a correctional officer and Plaintiff's mere assertion that the lockdown was not "narrowly applied" is not admissible evidence.  Thus, Plaintiff does not establish a factual dispute to DUF 64.

Plaintiff also admits that he is without sufficient information to admit or deny staff activity during this lockdown.  (Doc. 113, PDF 65, pp. 38-39.)  However, he argues that the absence of any such entries establishes that "Defendants do not, or did not limit, or narrowly apply the extended and excessive lockdowns complained, from January 2004 to May 2005."  (Id., *citing* PSFR 20.)  In PSFR 20, Plaintiff states that he was confined to his cell for approximately four hundred forty-seven (447) days out of the approximately five hundred eight (508) days he

was housed at SATF from January 2004 through May of 2005.  (Doc. 109, PSFR 20, p. 7, *citing*

"Ex. IX.")  As previously discussed, *see* supra Part VI.B.3.a.(2), Exhibit IX to the PDF is a

voluminous stack of papers identified by Plaintiff as "Daily Activities Logbook" which is slightly

over an inch thick.  (Doc. 116, pp. 13-101; Doc. 117, pp. 1-75; Doc. 118, pp. 1-56.)  The same

description applies to Exhibit IX to the PSFR.  (Doc. 110-1, pp. 15-70; Doc. 110-2, pp. 1-55;

Doc. 111, pp. 1-75; Doc. 111-1, pp. 1-27.)  Plaintiff neither cites to a specific page within either

Exhibit IX to the PDF or the PSFR that he relies on, nor explains how these stacks of documents

support his assertion that "Defendants do not, or did not limit, or narrowly apply the extended

and excessive lockdowns complained, from January 2004 to May 2005."  (Doc. 113, PDF 65, pp.

38-39.)  Thus, Plaintiff does not create a dispute of fact as to DUF 65.

Plaintiff admits that he is without sufficient knowledge to admit or deny staff activities

during this lockdown, but he admits and requests judicial notice be taken that the records show

that he was denied yard and confined to his cell from April 9 to April 21, 2005.  (Doc. 113, PDF

66, p. 39, *citing* PSFRs 20, 21.)  As previously stated, "[a] judicially noticed fact must be one not

subject to reasonable dispute in that it is either (1) generally known within the territorial

jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to

sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Whether

sufficient evidence was submitted to establish a fact as undisputed is not something which can be

judicially noticed.  Plaintiff's request for judicial notice is denied.

Again, as previously discussed, *see* supra Part VI.B.3.a.(2), in PSFR 20 Plaintiff states

that he was confined to his cell for approximately four hundred forty-seven (447) days out of the

approximately five hundred eight (508) days he was housed at SATF from January 2004 through

May of 2005.  (Doc. 109, PSFR 20, p. 7, *citing* "Ex. IX.")  The size of Exhibit IX to the PDF and

the PSFR was discussed earlier in this section.  Plaintiff neither cites to a specific document

within either Exhibit IX to the PDF or the PSFR that he relies on, nor explains how these stacks

of documents support his assertion that "Defendants do not, or did not limit, or narrowly apply

the extended and excessive lockdowns complained, from January 2004 to May 2005."  (Doc.

113, PDF 65, pp. 38-39.)  PSFR 20 does not establish a factual dispute.  *See* supra Part

1  VI.B.3.a.(2).

2       As also previously discussed, *see* <u>supra</u> Part VI.B.3.a.(2), in PSFR 21, Plaintiff provides a

3  chronology of the dates he was confined to his cell and cites to Exhibit X -- which is attached to

4  the PSFR at pages 28-48 of Doc. 111-1 and is attached to the PDF at pages 57-76 of Doc. 118.

5  In PSFR 21, Plaintiff states that his cell confinement included, but was not limited to the

6  segments of time he listed, but he once again neither explains how his dates, or the documents in

7  Exhibit X, are incomplete, nor contradicts the dates and explanations provided by Defendants via

8  Wan's declaration and attached exhibits which are found at Docs. 82 through 82-6.  Further,

9  since Plaintiff admits that he lacks sufficient knowledge to admit or deny staff activity during this

10  lockdown he cannot create a dispute of fact via PDF 66.

11       Finally, Plaintiff argues that since Defendants did not account for what occurred on April

12  14th, 15th, 16th, and 18th it shows that they did not narrowly apply the "extended and excessive

13  lockdowns" complained of for the relevant time.  However, failure to account for four days of

14  activities during a lockdown precipitated by a "kite" informing of an impending attack on

15  correctional staff does not make the lockdown extended and/or excessive.  DUF 66 is properly

16  deemed undisputed.

17                    **(15)    <u>May 27 - 31, 2005</u>**

18       May 27 through May 31, 2005.  Facility C was placed on lockdown effective May 27,

19  2005, due to a possible threat to staff.  A threat assessment was conducted into the validity of the

20  allegations, with negative results.  (Doc. 79, DUF 67.)

21       During this lockdown the staff did the following: (<u>Id.</u>, at DUF 68.)

22            May 27.  Staff meeting.  MAC reps out.

23            May 28.  Staff meeting.

24            May 29.  Threat assessment team interviews 20+ inmates.

25            May 30 - 31.  Searches.

26                    **(a)    <u>Plaintiff's Opposition</u>**

27       Plaintiff admits that he lacks sufficient information to admit or deny staff activity during

28  this lockdown, but states that he was confined to his cell from May 18 to May 31, 2005.  (Doc.

113, PDF 68, p. 40, *citing* PSFRs 20, 21.)  As previously discussed, PSFRs 20 and 21 do not

raise a triable issue of fact sufficient to dispute DUF 68.  *See* supra Part VI.B.3.a.(2).  Plaintiff

did not submit any evidence to support his assertion that he was confined to his cell from May 18

trough May 26.

### (16)    June, 2005

On Saturday, June 4, 2005, at approximately 09:40 hours, Plaintiff stabbed two

Correctional Officers.  (Doc. 79, DUF 69.)

### (a)    Plaintiff's Opposition

Plaintiff objects that DUF 69 is irrelevant and inadmissible pursuant to Federal Rules of

Evidence 608 and 609.  (Doc. 113, PDF 69, p. 41, *citing* PSFR 49.)  As previously discussed, *see*

supra Part III.B.1., Plaintiff's objection is overruled as his prison disciplinary record is relevant to

the defense of any argument by Plaintiff that he was not a threat to the safety and security of the

prison such that, as applied to him, lockdowns did not serve a penological purpose.  (Doc. 123,

Def. Resp. & Obj to PSFR 49, p. 16.)  Further, this infraction by Plaintiff precipitated his

reassignment out of the GP at SATF.

### b.    Discussion

### (1)    Objective Element - Sufficiently Grave Condition

Plaintiff arrived at SATF on January 13, 2004 where he was cleared for general

population yard from January 29, 2004 through June 4, 2005 – a total duration of just over

sixteen months.  (Doc. 79, DUFs 10, 11.)  During this time, there were numerous lockdowns that

affected Plaintiff (id., at DUFS 37-68 .)  Even without taking Plaintiff's evidence and/or

opposition into account, there were only four of the sixteen months in question which were not

interrupted by lockdown(s).  Therefore, limited purely to the resolution of this motion, the Court

assumes, without deciding, that the deprivation of out of cell time experienced by Plaintiff was

sufficiently grave to satisfy the objective element of an Eighth Amendment claim.

### (2)    Subjective Element - Deliberate Indifference

Defendants submitted evidence to show that:

(1)     the lockdowns which affected Plaintiff arose from significant security threats ti

staff received via confidential communications from inmates (Doc. 79, DUFs 41,

59, 64, 67), discovery of inmate-manufactured weapons (id., at DUFs 47, 57, 61),

searches for weapons subsequent to a peace officer's murder at another facility

(id., at DUF 55), and for security maintenance to repair vandalism to cell-doors by

inmates (id., at DUFs 49, 50);

(2)     when possible, lockdowns were narrowly applied to the particular gang, racial

group, or housing unit which caused a given incident (id., at DUF 33);

(3)     during lockdowns, threat levels were assessed by conducting searches and

interviewing inmates (id., at DUFs 42, 48, 50, 56, 58, 60, 62, 65, 66, 68);

(4)     when searches were needed, searching a cell took two officers at least twenty

minutes with a total of fifteen to twenty days to search all of the cells in Plaintiff's

housing unit – Facility C (id., at DUF 32);

(5)     many of the searches during lockdowns uncovered inmate-manufactured weapons

(id., at DUFs 41, 47, 57, 59);

(6)     after a lockdown is imposed, an investigation of the incident(s) is initiated to

determine the cause of the disturbance and to ascertain when inmates might safely

be released from lockdown (id., at DUF 30);

(7)     all inmates in the area in which the lockdown is imposed are interviewed; all cells

and common areas are searched; members of the Men's Advisory Council (MAC

reps -- elected inmate representatives) are interviewed to both develop and

substantiate information; central files are reviewed to verify information; when

the investigation is complete, it is the responsibility of the Captain to develop a

plan for releasing inmates from lockdown status (id., at DUF 31); and

(8)     Plaintiff was not necessarily a peaceful inmate, as evidenced by his disciplinary

record, which made it reasonable to include him in lockdowns with similar

inmates (id., at DUFs 12, 13, 14).

These statements of fact meet Defendants' burden to show that they were not deliberately

indifferent in their imposition of lockdowns as all lockdowns during the time in question

54

(February of 2004 through June of 2005) were imposed in response to safety and security threats, that during lockdowns investigations and searches were conducted, that searches which resulted in confiscation of weapons made Facility C safer such that lockdowns were necessary and reasonable, and that inmates were released from lockdown status once it was determined safe to do so.

Plaintiff's efforts to raise a triable issue of material fact on this point fall short. Plaintiff does not submit admissible evidence to show that he was subjected to lockdowns that were implemented and extended in deliberate indifference to his rights under the Eighth Amendment. For example, Plaintiff attempts to oppose DUF 21 (asserting that if inmates were escorted to and allowed to use small exercise during lockdowns, investigatory efforts to identify the instigators of a given incident would be delayed thereby lengthening the time of deprivation of all inmates from the main yard (Doc. 79, DUF 21)) by arguing that Defendants "knew, or very well should have know 'who' participated, or was planning to participate in any incident, or attack" and that once the participants are identified, they "are immediately removed" from the general population and that the "extended and excessive lockdowns imposed by Defendants [] were unnecessary and an over-exaggerated response to a handful of isolated and,or [sic] spontaneous incidents (most of which were outdated) where Defendants knew or very well should have known of the participants (person or partys [sic]) involved in any actual or planned misconduct, or attacks as noted in the program status reports." (Doc. 113, PDF 21, *citing* PSFRs 20, 34.) PSFRs 20 and 34 are the only efforts Plaintiff makes to submit evidence of these assertions.

As previously discussed PSFR 20 is insufficient to raise a triable issue of fact. *See* supra Part VI.B.3.a.(2). In PSFR 34 Plaintiff argues that it is unfair for GP inmates to remain on lockdown while instigating inmates are "placed in ASU or SHU and are where they receive regular and,or [sic] adequate yard, outdoor exercise/recreation, fresh air, direct sunlight, group interaction/activities, etc." (Doc. 109, PSFR 34, *citing* "Ex. 'III' CCR 3330 and Ex XIII.") As found in both Ex. III to the PDF and the PSFR, CCR 3330 provides the parameters applicable to disciplinary detention – including, as previously discussed, the requirement for ten hours out of cell each week – which do not apply to Plaintiff since he was a GP inmate. *See* supra Part

VI.B.3.a.(3).  Ex. XIII to the PDF and the PSFR contain the article "Deprivation Study on the

Effects of Isolation," which, as previously discussed, *see* supra Part III.A.2., is inadmissible since

Defendants' objection for lack of proper authentication is sustained.  Further, Plaintiff thwarts his

own assertions in PSFR 34 through his statements that he lacks sufficient information or

knowledge to admit or deny the reasons for the lockdowns, or the efforts taken by prison officials

during the lockdowns.  (Doc. 113, PDFs 29, 31, 41, 42, 43, 44, 46, 47, 48, 49, 50, 51, 52, 53, 55,

56, 57, 58, 59, 60, 61, 62, 64, 65, 66, 67, 68.)  Thus, PSFR 34 does not raise a triable issue of fact

to dispute DUF 21.

Finally, Plaintiff opposes DUF 31 (asserting that all inmates in an area that is lockeddown

are interviewed) by arguing that, in his "experience while at CSATF "C" Facility that not all

prisoners (more specifically that [he] personally) was/were not interviewed during, or before

releasing of all lockdowns imposed."  (Doc. 113, PDF 31, *citing* PSFR 51.)  As previously noted,

the PDF is not verified and is not admissible.  PSFR 51 asserts that "custody staff did not

conduct interviews with prisoners affected by the lockdowns prior to release, or resuming those

limited services, functions, activities, etc. noted under the modified program threat assessments

and interviews were conducted only when there was an incident, or alleged planned attack on

staff.[14]"  (Doc. 109, PSFR 51 (emphasis in the original).)  It is notable that though the PSFR is

verified, PSFR 51 does not contain any statements regarding Plaintiff's experience and/or any

basis for Plaintiff to have knowledge of the investigative activities by custody staff during

lockdowns in order for PSFR 51 to be admissible and Plaintiff has no expertise in prison

management to be able to offer his own opinion on matters which require scientific, technical, or

other specialized knowledge.  Fed. R. Evid. 701, 702.

Purely for the sake of argument, even if he had included his statement from PDF 31 (that

he personally was not interviewed during, or before all lockdowns were lifted) in PSFR 51,

---

[14] It is noteworthy that, in PSFR 51, Plaintiff appears to lament and/or complain that not every inmate in a
lockeddown area were always interviewed before lockdowns were lifted.  However, if prison staff always waited to
lift a lockdown until they had interviewed every single inmate in a lockeddown area before lifting the lockdown –
even if they were aware that the safety and security risk had been abated after interviewing only a limited number of
affected inmates – such actions would very likely have violated inmates' rights under the Eighth Amendment for
deliberate indifference to the inmates' rights.

1  Plaintiff would fare no better.  Whether every single affected inmate was interviewed before

2  every lockdown was lifted is not pivotal in this case and in fact, if lockdowns were extended

3  purely for the interviewing of every affected inmate where the safety and security of the

4  institution was no longer in question, the inmates' rights under the Eighth Amendment would

5  most probably have been violated.  That Plaintiff was not personally interviewed before each and

6  every lockdown was lifted speaks more to prison officials lifting lockdowns as soon as safe to do

7  so rather than to any deliberate indifference on their part.  It is reasonably extrapolated from

8  Plaintiff's statement that he was not always (if ever) interviewed before a lockdown was lifted

9  because lockdowns may have been shortened by custody staff lifting lockdowns once they felt

10 the security threat had been abated rather than continuing a lockdown despite restoration of

11 security, merely for the sake of making sure that each inmate under the lockdown had been

12 interviewed.

13         Further, DUF 34 states that the investigative process and the process of releasing inmates

14 from a lockdown can include individual and group interviews with all inmates, and can include

15 the release of inmate "representatives" for the purpose of allowing them to speak with other

16 inmates about the lockdown and any ongoing disputes between various ethnic groups and

17 attempts to mediate any underlying dispute among the inmate groups.  (Doc. 79, DUF 34.)

18 Plaintiff attempts to oppose DUF 34 by asserting that "all the incidents which occurred on the

19 'C' facility during relevant times were isolated and,or [sic] spontaneous [sic] easily identifiable

20 individuals and.or [sic] individual housing units/buildings rendering any investigative measures

21 of the entire GP [sic] when defendants knew that the incident involved a specific

22 individual/group/housing unit shows that the lockdown imposed during relevant times were an

23 overexaggerated [sic] response."  (Doc. 113, PDF 34, *citing* PSFR 54.)  PSFR 54 states that

24 "[t]he modified program implemented by defendants as named was an over exaggerated response

25 based on suspensions [sic] and speculations and without any actual, or viable emergencys [sic]

26 the harsh and highly restricted modifications imposed which failed to meet required minimum

27 standards of prisoners basic human needs can [sic] not stand up to constitutional scrunity [sic]

28 and are arbitrary and capricious."  (Doc. 109, PSFR 54.)  At the end of PSFR 54, Plaintiff cites

1   "see cases cited Plaintiff's Mot. Opp. Def. Mot. For Sum. J."  This citation to the case law cited

2   in Plaintiff's opposition does not qualify as evidence and Plaintiff fails to show any basis for

3   personal knowledge upon which the statements in PSFR 54 are based.  Thus, PSFR 54 is not

4   admissible.

5         Lawful incarceration brings about the necessary withdrawal or limitation of many

6   privileges and rights.  Bell, 441 U.S. 520; *also* Hudson, 468 U.S. at 524.  It is well-established

7   that the problems that arise in the day-to-day operation of a corrections facility are not

8   susceptible of easy solutions, and prison administrators therefore should be accorded wide-

9   ranging deference in the adoption and execution of policies and practices that in their judgment

10  are needed to preserve internal order and discipline and maintain institutional security.  Bell, 441

11  U.S. at 545-46 (quotation marks omitted); *also* Whitley, 475 U.S. at 321-22; Rhodes, 452 U.S. at

12  348-51; Noble, 646 F.3d at 1143; Norwood, 591 F.3d at 1066.

13        A prisoner's right to outdoor exercise is neither absolute and indefeasible nor does it

14  trump all other considerations.  Norwood, 591 F.3d at 1068.  Prison officials have a duty to

15  ensure the safety and security of inmates and staff, and this imperative must be balanced against

16  other legal obligations, including outdoor exercise.  Id. at 1069.  Prison officials have a right and

17  a duty to take the necessary steps to reestablish order in a prison when such order is lost, id.

18  (quotation marks and citation omitted), and they are entitled to wide-ranging deference in their

19  discharge of this responsibility, so long as that deference does not manifest deliberate

20  indifference or an intent to inflict harm, Noble, 646 F.3d at 1143, 1147-48.

21        Complex II of SATF consists of Facility C, which is a Level IV, maximum-security (180°

22  design) facility in which Plaintiff was housed.  (Doc. 79, DUF 15.)  It is called a "180° Facility"

23  because a guard standing in front of the buildings can see all buildings at once in a 180° arc.

24  (Id.)  Facility C is the only Level IV maximum-security facility that houses the Level IV general

25  population inmates.[15]  (Id., at DUF 16.)  The lockdowns that Plaintiff endured were instituted in

26  response to a number of legitimate threats to the safety and security of inmates, staff, or both.

27  _____

28        [15] It is understood that Level IV general population inmates pose greater security and safety problems than
    those in lower levels.

1   When possible, lockdowns were narrowly applied to the particular gang, racial group or housing

2   building causing the violence.  (Doc. 79, DUF 33, *citing* Wan Decl. ¶ 30; Plntf's Dep. 49:6-12.)

3   Decisions by prison officials regarding restoring Normal Program after a lockdown for safety and

4   security reasons (i.e. balancing safety against the inmates' need for exercise) will not be second-

5   guessed.  *See* Norwood, 591 F.3d at 1069-70.

6        Defendants had a duty to restore order following threats to the safety and security of the

7   institution, staff, and/or inmates and to ensure Plaintiff's safety while doing so, along with the

8   safety of the other inmates and correctional staff.  Noble, 646 F.3d at 1143, 1147-48; Norwood,

9   591 F.3d at 1069-70.  Defendants' responses to the threats presented throughout Plaintiff's time

10  at SATF were well within the wide-ranging discretion to which they are entitled.  Noble, 646

11  F.3d at 1143; Norwood, 591 F.3d at 1069-70.

12       There is simply no evidence raising a genuine dispute as to any material fact regarding the

13  need for the lockdowns or the need to lift the lockdowns any sooner than actually occurred.

14  Noble, 646 F.3d at 1143; Norwood, 591 F.3d at 1070.  In short, there is no evidence that

15  Defendants Adams, Wan, and/or Hansen acted with deliberate indifference in either the

16  implementation and/or the duration of the lockdowns that affected Plaintiff during his stay at

17  SATF.  Noble, 646 F.3d at 1147-48.

18       Accordingly, the Court finds that Defendants Adams, Wan, and Hansen have met their

19  burden to be granted judgment as a matter of law on Plaintiff's claim that he was deprived

20  exercise in violation of his rights under the Eighth Amendment.  Plaintiff failed to meet his

21  responsive burden to raise a triable issue of fact.

22       **C.    Qualified Immunity**

23       Defendants Adams, Wan, and Hansen[16] also argue that they are entitled to qualified

24  immunity.  For the reasons previously set forth, the Court finds that these three Defendants are

25

26       [16] The only qualified immunity arguments raised by Defendants in this motion relate to Plaintiff's claims
27  regarding his ability to access the outside yard and imposition/continuation of lockdowns.  Since, as previously
    discussed, Defendant Beeler's only involvement in this issue was his handling of Plaintiff's inmate appeal and he had
28  nothing to do with setting yard schedules and/or imposition of lockdowns, the qualified immunity arguments raised
    by Defendants do not apply to Plaintiff's claims against Defendant Beeler and no such intent was ever stated.

entitled to judgment as a matter of law on Plaintiff's claims against them.  Alternatively, these three Defendants are also entitled to qualified immunity.

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986).

In resolving a claim of qualified immunity, courts must determine whether, taken in the light most favorable to the plaintiff, the defendant's conduct violated a constitutional right, and if so, whether the right was clearly established.  Saucier v. Katz, 533 U.S. 194, 201 (2001); Delia v. City of Rialto, 621 F.3d 1069, 1074 (9th Cir. 2010); Mueller v. Auker, 576 F.3d 979, 993 (9th Cir. 2009).  While often beneficial to address in that order, courts have discretion to address the two-step inquiry in the order they deem most suitable under the circumstances.  Pearson, 555 U.S. at 235-36 (overruling holding in Saucier that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); Delia, 621 F.3d at 1074-75; Mueller, 576 F.3d at 993-94.

As to the objective element, the court has already discussed how the case law is still not clear as to whether Plaintiff's experience of numerous lockdowns constitutes a sufficiently grave condition implicating the Eighth Amendment.  Regarding the subjective element, even as recently as 2010 and 2011, there was no clearly established requirement(s) as to how or when prison officials must lift a lockdown, or how a modified program should be implemented in response to threats to the safety and security of the institution arising from riots, or information that inmates plan to assault staff and introduce narcotics and contraband into the prison.  Noble, 646 F.3d at 1148-48; Norwood, 591 F.3d at 1070.  In light of the undisputed evidence regarding the reasons for the lockdowns/modified programs, the investigatory steps that must be

undertaken in responding to the events, and the need to lift the lockdowns/modified programs in

stages depending upon the results of the investigations and occurrence of incidents as programing

resumes, it would not have been clear to a reasonable officer that restricting an inmate's outdoor

exercise in conjunction with the lockdowns/modified programs at issue here was unlawful.

Therefore, Defendants Adams, Wan, and Hansen are entitled to qualified immunity.

**VII.    Order**

        For the reasons set forth herein, IT IS HEREBY ORDERED that:

        1.       The motion for summary judgment, filed December 1, 2008 (Doc. 77), by

                      Defendants Adams, Wan, Hansen, and Beeler, is GRANTED:

                a.      Defendants Beeler, Adams, Wan, and Hansen are entitled to judgment as

                          a matter of law on Plaintiff's Eighth Amendment claim; and

                b.      Defendants Adams, Wan, and Hansen are also entitled to qualified

                        immunity;

        2.       This action is dismissed, with prejudice; and

        3.       The Clerk of the Court shall enter judgment in favor of the Defendants and shall

                     CLOSE this case.

IT IS SO ORDERED.

Dated:    November 28, 2012

                                            UNITED STATES DISTRICT JUDGE